1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

HERBERT R. PUTZ, et al.,

              Plaintiffs,

      v.

MICHAEL H. GOLDEN, et al.,

              Defendants.

CASE NO. C10-0741JLR

ORDER DENYING MOTION
FOR SUMMARY JUDGMENT

15

## I.    INTRODUCTION

16

    Before the court is Defendants Michael H. Golden and Suzanne C. Golden's ("the

17

Goldens") motion for summary judgment (Dkt. # 45).  Having considered the motion, the

18

parties' submissions filed in support and opposition thereto, the applicable law, and being

19

fully advised, the court DENIES the motion.[1]

20

21

22

[1]The Goldens have requested oral argument.  (Mot. (Dkt. # 45) at 1.)  The court,
however, determines that this motion is appropriate for decision without oral argument.  The
general rule is that the court may not deny a request for oral argument made by a party opposing

## II.   BACKGROUND

Defendant Societe Civile Immobiliere Paepaepupure ("SCIP") is a resort, which was originally developed in the 1970's and consists of 16 bungalows in Paepaepupure, Bora Bora in French Polynesia.  (*See* Hall Decl. (Dkt. # 49) Ex. 1 (M. Golden Dep.) at 13:15-14:13.)  SCIP is governed by statutes, which are similar to articles of incorporation.  (*Id.* Ex. 6.)  Management of SCIP is placed in the hands of a *gerant*, which is the French term for manager.  (*Id.* Ex. 6 at 25-31.)  In addition to the *gerant*, there is a "Supervisory Committee" made up of three SCIP shareholders, or "associates." (*Id.* Ex. 6 at 35-36.)  The members of the Supervisory Committee sometimes refer to themselves informally as "the Board."  (*See, e.g.*, *id.* Ex. 1 (M. Golden Dep.) at 20:15 – 22:18.)

In 1977, the Goldens purchased 19 SCIP shares (## 223-241), representing the right to use Bugalow # 12 within the SCIP development.  (*See* Hall Decl. Ex.1 at 13:15-14:13.)   As part of the transaction, the Goldens received a formal "*cession de parts*," which provided evidence of the Goldens' ownership of SCIP shares ## 223-241.  (*Id.* Ex. 4.)  After purchasing the rights to use Bunglow # 12, Mr. Golden became a member of

---

a motion for summary judgment unless the motion is denied.  *Dredge Corp. v. Penny*, 338 F.2d 456, 462 (9th Cir. 1964).  Here, the court is denying the motion, and the parties opposing summary judgment have not requested oral argument.  (*See* Resp. (Dkt. # 50) at 1 (containing no request for oral argument in the caption as require by Local Rule W.D. Wash. CR 7(b)(4).) Federal Rule of Civil Procedure 56 does not require a hearing where the opposing party does not request it.  *See, e.g.*, *Demarest v. United States*, 718 F.2d 964, 968 (9th Cir. 1983).  Further, oral argument is not required if the party requesting oral argument suffers no prejudice.  *Houston v. Bryan*, 725 F.2d 516, 517-18 (9th Cir. 1984).  The issues have been thoroughly briefed by the parties and oral argument would not be of assistance to the court.  The court finds that the Goldens are not prejudiced by the denial of oral argument in this case.

1  SCIP's Supervisory Committee.  (Jordan Decl. (Dkt. # 51) Ex. 1 (M. Golden Dep.) at

2  20:23 – 21:19.)  Mr. Golden served in this capacity from approximately 1980 through the

3  sale of his shares in 1987.  (*Id.* Ex. 1 at 21:20-25.)

4      In 1987, the Goldens and Plaintiff Herbert R. Putz executed an agreement and

5  addendum ("the 1987 Agreement") for the sale of the 19 shares representing Bungalow #

6  12.  (*See* Hall Decl. Ex. 5.)  The Goldens agreed to sell their shares to Dr. Putz  "and/or

7  [his] assigns."  (*Id.*)  The 1987 Agreement consists of a two-page real estate purchase and

8  sale agreement, dated February 23, 1987, and a one-page addendum signed by Dr. Putz

9  on March 5, 1987, and by the Goldens on March 29, 1987.  (*Id.*)  Dr. Putz agreed to pay

10  $117,500.00 for the SCIP shares representing Bungalow # 12.  (*Id.* Ex. 5 at 1.)  The

11  addendum included a paragraph, stating:  "Sellers [the Goldens] will arrange that the

12  Board of Directors will approve the transfer of the stocks as required by the By-Laws of

13  the Corporation."  (*Id.* Ex. 5 at 3.)

14      In order to limit his personal liability, Dr. Putz decided to form a New York

15  corporation named Panonia Realty Corporation ("Panonia") to be the owner of the SCIP

16  shares.  (*Id.* Ex. 2 (Putz Dep.) at 70:13-21.)  Panonia is a plaintiff, along with Dr. Putz, in

17  this litigation.  In order to complete the transfer, Dr. Putz incorporated Panonia and sent

18  Panonia's corporate documents to the Goldens.  (Jordan Decl. Ex. 6.)  The Goldens

19  signed Panonia's corporate documents, and then transferred their SCIP shares to Panonia.

20  (*See generally* Hall Decl. Ex. 2 (Putz Dep.) at 83:4 – 85:5.)  At the time that the Goldens

21  transferred the SCIP shares to Panonia, the Goldens were Panonia's only officers,

22  directors, and shareholders.  (Jordan Decl. Ex. 1 (M. Golden Dep.) at 102:25-103:11.)

1    The Goldens then transferred or assigned all of their Panonia shares to Dr. Putz.  (*Id.*)  As

2    a result, Dr. Putz became the sole owner of Panonia, which in turn owned the SCIP

3    shares.  (*Id.*)  Dr. Putz paid the Goldens $117,500.00 as required by the 1987 Agreement.

4    (*Id.* Ex. 1 at 125:2-3; 126:4-7.)

5          For nearly twenty years, all of the parties to the transaction believed that the 19

6    SCIP shares had been properly transferred from the Goldens to Plaintiffs.  Indeed, Dr.

7    Putz enjoyed the use of Bungalow # 12, both personally and as a vacation rental property,

8    until 2007.   (Hall Decl. Ex. 2 (Putz Dep.) at 86:19-87:4.)  He paid SCIP maintenance

9    fees during this period.  (*Id.* Ex. 2 at 99:16-25; 86:19-25.)  He even served as SCIP's

10   *gerant* from May 1993 through September 2002.  (*See id.* Ex. 2 at 25:4-29:19.)

11         Plaintiffs now assert, however, that the Goldens latently breached the 1987

12   Agreement in a manner that did not become apparent for nearly twenty years.  (*See* Resp.

13   (Dkt. # 50) at 7-11.)  Specifically, Dr. Putz and Panonia allege that the Goldens failed to

14   transfer the 19 SCIP shares in accordance with French Polynesian law and also breached

15   the provision of the 1987 Agreement which required them to "arrange that the Board of

16   Directors will approve the transfer of the stocks as required by the By-Laws of the

17   Corporation."  (*Id.* at 5 (citing Hall Decl. Ex. 5).)  There are myriad factual disputes with

18   regard to all of the Plaintiffs' theories concerning breach.

19         First, Dr. Putz and Panonia allege that the Goldens failed to contact the

20   appropriate persons at SCIP to obtain the required approval from SCIP's Supervisory

21   Committee.  (*See* Resp. at 5.)  Plaintiffs assert that the Goldens sent Panonia's corporate

22   documents only to Norton Brown, whose firm functioned as accountants for SCIP.

1  (Jordan Decl. Ex. 1 (M. Golden Dep.) at 36:6-9 & Ex. 1 (M. Golden Dep. II) at 8:22-9:1.)

2  Plaintiffs argue that Mr. Brown could not have been a member of the Supervisory

3  Committee because he was not a SCIP shareholder.  (*See* Resp. at 5 (citing Jordan Decl.

4  Ex. 9 (March 31, 1986 list of SCIP bungalow owners which does not include Mr.

5  Brown)).)  By notifying only Mr. Brown, Plaintiffs argue that the Goldens failed to

6  obtain the required approval of the SCIP board or Supervisory Committee.  (*See id.*)

7      The Goldens respond that Mr. Brown served as the *gerant* or manager of SCIP,

8  and that in this role he had the authority to approve sales of shares to a third party.  (Mot.

9  at 4, 6-7 (citing Hall Decl. Ex. 6 at 11-12; Ex. 1 (M. Golden Dep.) at 36:21-37:2.)  There

10  is also testimony from Mr. Golden indicating that Mr. Brown served on SCIP's board or

11  Supervisory Committee, as well.  (*Id.* Ex. 1 at 29:2-17.)  Further, Mr. Golden sent a letter

12  addressed to "Board of Directors Societe Paepaepupure" describing the pending sale of

13  Bungalow #12 to Dr. Putz, although the letter does not mention Panonia's involvement in

14  the sale.  (*Id.* Ex. 7.)  The face of the letter indicates that Mr. Golden sent it to Ms.

15  Rosette Valente, who was another SCIP board member, and to Mr. Brown, and that

16  neither of these individuals ever objected to the sale.  (*Id.* Ex. 1 at 62:9-17, Ex. 7.)

17  Finally, SCIP's lawyer, Claude Girard, sent a letter to Dr. Putz confirming that both he

18  and Panonia had "the right of occupancy as an ownership of bungalow n* 12."  (*Id.* Ex.

19  9.) Thus, the Goldens assert, based on this evidence, that SCIP effectively approved the

20  sale, and that therefore the Goldens did not breach the 1987 Agreement.  (Mot. at 16-17.)

21      Second, Plaintiffs assert that the Goldens breached the 1987 Agreement by failing

22  to follow SCIP's Article 13 requirements for the transfer of shares.  (Resp. at 5-6 (citing

Hall Decl. Ex. 6 at 11-14).)  Article 13A of SCIP's governing statutes required the

Goldens to notify SCIP of their intention to transfer their SCIP shares to Panonia using a

registered letter containing the full name, residence, and nationality of the buyer, as well

as the purchase price.  (Hall Decl. Ex. 6 at 12.)  Mr. Golden admits that he did not send a

registered letter, and that his notice to the board did not include the items listed in Article

13A.  (Jordan Decl. Ex. 1 (M. Golden Dep.) at 41:9-15, 41:21-25, 70:18-71:1, 130:15-

131:5.)  In return, SCIP management was required to send to the Goldens a registered

letter with return receipt indicating the management's approval or disapproval of the

share transfer.  (Hall Decl. Ex. 6 at 12.) The Goldens have never been able to produce

this document.  (Resp. at 6.)  The Goldens respond that it is unsurprising that after all of

these years neither they nor SCIP is able to produce SCIP's consent letter.  (Reply (Dkt. #

52) at 8-9.)  They argue that this fact does not prove that the letter was not in fact sent, or

that SCIP did not approve the sale at the time it occurred.  (*Id.*)

Third, Plaintiffs assert that the Goldens breached the 1987 Agreement by selecting

an improper person to accomplish the actual transfer of the shares.  (Resp. at 6-7.)

Plaintiffs assert that the Goldens selected attorney Claude Giraud to draft the legal

documents, a *cession de parts*, and notify the parties when he had transferred the shares.

(Jordan Decl. Ex. 1 (M. Golden Dep.) at 51:25 – 52:23, 53:13-20; Hall Decl. Ex. 10.)  It

is, however, undisputed that Mr. Girard was not a *notaire*, and that under French

1   Polynesian law he could not legally transfer SCIP's shares.  (Mot. at 8; Resp. at 7.)[2]  The

2   Goldens counter that Dr. Putz has admitted that he added Mr. Giraud's name to the

3   addendum of the 1987 Agreement, and therefore he can hardly complain about Mr.

4   Giraud's selection.  (Reply at 8 (citing Supp. Hall Decl. (Dkt. # 53) Ex. A (Putz Dep.) at

5   59:24 - 60:1).)

6          Plaintiffs assert that they did not discover the Goldens' alleged latent breach of the

7   1987 Agreement for nearly twenty years.  (Resp. at 7.)  As described below, Dr. Putz

8   asserts that he did not discover the Golden's breach until after his ouster by SCIP from

9   Bungalow # 12 in 2007 and the Goldens' subsequent refusal to assist him in regaining

10  access to the bungalow.  (*See* Resp. at 13.)  Dr. Putz's history with SCIP, however, has

11  involved a number of conflicts with other SCIP shareholders.  As a result of this history,

12  the Goldens assert that Dr. Putz should have realized long before 2007 that there might

13  have been a problem with Panonia's ownership of SCIP shares.  (Mot. at 15-16.)

14         In 2000, Michael Cavalli, the president of a California corporation, contacted Dr.

15  Putz in his capacity as *gerant* of SCIP, to inquire about the process of converting SCIP

16  shares into a deed or "to co-ownership" and withdrawing from SCIP.[3]  (Cavalli Decl.

17  (Dkt. # 46) ¶ 9, Ex. B.)  On August 5, 2000, Dr. Putz initially responded by stating that

18

19
        [2] Although the Goldens have brought a third-party complaint against Mr. Girard (Answer
20  (Dkt. # 41) at 23-27), they have not pursued their case against him.

21         [3] The parties are in dispute as to how the process of withdrawing from SCIP should be
    characterized under French Polynesian law – whether as a conversion of SCIP shares to a deed or
22  to "co-ownership."  (*See* Mot. at 8; Resp. at 8.)  This factual dispute, however, is immaterial with
    respect to the issues the court must resolve in this motion.

1 "[a]ccording to the corporate records of SCIP you are not a stockholder in SCIP."  (Supp.

2 Hall Decl. Ex. C.)  Later, on August 17, 2000, Dr. Putz wrote:

3 > Without the approval of transfer by the French Polynesian government [the
>  California corporation] can not [sic] legally become the stockholder of the
4 > shares # 111-127 in SCIP.

5 (Cavelli Decl. Ex. E.)  The Goldens argue that this correspondence indicates that Dr. Putz

6 had access to SCIP corporate records during his tenure as *gerant* and that he knew or

7 should have known that there might be a legal problem with Panonia's ownership of

8 SCIP shares.  (Mot. at 15; Reply at 9-10.)

9    Mr. Cavalli, however, purchased his shares after 1990 (Cavalli Decl. ¶ 2), which

10 was the effective date for the French Polynesian law requiring the authorization of the

11 French Polynesian government for the transfer of shares giving rights to land to

12 foreigners (Leou Decl. (Dkt. # 47) ¶ 5).  Dr. Putz's 1987 purchase of the shares

13 associated with Bungalow # 12 predates this statutory requirement.  Dr. Putz, therefore,

14 asserts that, unlike the situation involving Mr. Cavalli, the statute would not have applied

15 to Panonia's purchase of SCIP shares.[4]  (Resp. at 14-15.)  Dr. Putz has also testified that

16 despite the fact that he was authorized to access SCIP's files as *gerant*, SCIP's

17 bookkeepers or accountants, Brown & Kraft, refused to allow him access despite his

18 repeated requests.  (Jordan Decl. Ex. 7 (Putz Dep.) at 159:24-160:25.)

19

20

_____

21    [4] Further, Plaintiffs assert even assuming that the statute applied to any attempt by Dr.
Putz to convert his SCIP shares to a deed, this fact would not have alerted Dr. Putz and Panonia
22 that they were not the owners of the SCIP shares representing Bungalow # 12.  (Reply at 15.)

1    During his tenure as *gerant*, Dr. Putz had several conflicts with other SCIP

2    shareholders.  He opposed an attempt by a group of shareholders to convert their SCIP

3    shares into deeds for their respective bungalows and withdraw from SCIP under Article

4    33 of SCIP's statutes.  (*Id.* Ex. 7 at 96:7-97:9.)  This group of shareholders ultimately

5    sued SCIP and won their right to withdraw as shareholders.  (*See Id.* Ex. 7 at 109:24-

6    110:2; *id.* Ex. 15.)  Dr. Putz also had an acrimonious dispute with another SCIP

7    shareholder, Frank Ergas.  Mr. Ergas had purchased the SCIP shares related to Bungalow

8    # 3, which had been destroyed by a cyclone.  (Hall Decl. Ex. 20.)  In his role as *gerant*,

9    Dr. Putz told Mr. Ergas that he could only rebuild his bungalow as it originally existed,

10   and as a result Mr. Ergas was furious.  (Hall Decl. Ex. 2 (Putz Dep.) at 98:9-24.)

11   In 2002, a French Polynesian court removed Dr. Putz as SCIP's *gerant* in a

12   proceeding initiated by Mr. Ergas (*id.* Ex. 2 at 49:1-12; Jordan Decl. Ex. 7 (Putz Dep.) at

13   96:7-18), and Mr. Ergas replaced Dr. Putz as the new *gerant* (Hall Decl. Ex. 2 (Putz

14   Dep.) at 98:25-99:2).  In October 2002, Dr. Putz wrote to Mr. Ergas in Mr. Ergas's

15   capacity as the new *gerant*, and requested the necessary documents for converting

16   Panonia's SCIP shares to a deed and withdrawing from SCIP.  (*Id.* Ex. 13.)  In August

17   2003, Mr. Ergas sent a SCIP form for withdrawal to Dr. Putz, which contained at least

18   two errors.  The form listed the Goldens as "Representative [sic] of the Company" that

19   owned shares "# 216-224."[5]  (*Id.* Ex. 15.)  The Goldens, however, were not

20   _____

21   [5] The form was written in a manner that asked the Goldens to "certify that the Shares
     designated above [#216-224] are indeed today the property of the company of which I am [sic]
22   the representative . . . ."  (Hall Decl. Ex. 15.)

1   representatives of Panonia, and the shares associated with Bunglow # 12 were not # 216-

2   224, but rather # 223-241.  In any event, Mr. Ergas ultimately refused to allow Dr. Putz

3   and Panonia to convert the shares associated with Bungalow #12 or to withdraw from

4   SCIP.  (Jordan Decl. Ex. 7 (Putz Dep.) at 97:10-25.)  Dr. Putz and Panonia eventually

5   brought a lawsuit against SCIP in a French Polynesian court in their ongoing attempt to

6   convert the SCIP shares and withdraw from the association.  (Hall Decl. Ex 16.)

7       In 2005, during the course of the French Polynesian litigation, SCIP argued that

8   the Goldens had not complied with SCIP statutes in transferring their shares to Panonia.

9   (Hall Decl. Ex. 16 at Golden-100466.)  In May 2005, during the course of the French

10  Polynesian litigation, Dr. Putz contacted the Goldens for the first time since 1987.  (Hall

11  Decl. Ex. 1 (M. Golden Dep.) at 115:22-117:11.)  Dr. Putz requested the Goldens'

12  assistance with regard to the French Polynesian litigation, and Mr. Golden agreed to help.

13  (*Id.*)  Mr. Golden executed an affidavit on May 31, 2005 in which he stated that he had

14  obtained SCIP management approval for his transfer of SCIP shares to Panonia in 1987.[6]

15  (Hall Decl. Ex. 17 (M. Golden Aff.) ¶¶ 4, 6.)

16      Despite Mr. Golden's sworn affidavit that he had transferred his SCIP shares to

17  Panonia, in February 2007, SCIP ousted Dr. Putz from possession of Bungalow # 12.

18  (Hall Decl. Ex. 2 (Putz Dep.) at 86:4-5.)  SCIP posted a notice on the door to Bungalow #

19  12 that declared the Goldens, and not Plaintiffs, as the true owners of the bungalow.

20  _____

21      [6] The current state of the litigation in French Polynesia is in dispute.  The Goldens assert
    that Dr. Putz can still ask the French Polynesian court to rule on Panonia's request to withdraw
22  from SCIP (Leou Decl. ¶ 7), while Dr. Putz asserts that he has lost his French Polynesian suit
    (Hall Decl. Ex. 2 (Putz Dep.) at 103:13-17).

1    (Jordan Decl. Ex. 2.)  The notice also stated that no one could legally rent the bungalow

2    from Plaintiffs.  (*Id.*)

3          In response, Dr. Putz contested the ouster with SCIP (Jordan Decl. Ex. 20) and

4    notified the Goldens (*id.* Ex. 1 (M. Golden Dep.) at 191:6-24).  Dr. Putz told the Goldens

5    that SCIP was asserting that the Goldens were the true owners of Bungalow # 12.  (*Id.*)

6    Dr. Putz asked the Goldens to execute a power of attorney that would enable him to enter

7    Bungalow # 12 and rent it to others, but at some point after April 2007, the Goldens

8    refused.  (*Id.* at 193:16-195:12.)  The Goldens assert that they refused Dr. Putz's request

9    because he asked for a general power of attorney (*id.*), but Dr. Putz asserts that he asked

10   only for a limited power of attorney directed solely toward permitting him to rent out

11   Bungalow # 12 (*see id.* Ex. 3).

12         Dr. Putz was also engaged in a dispute with SCIP concerning the payment of SCIP

13   association dues.  (*See* Jordan Decl. Ex. 23.)  Dr. Putz asserts that he paid all SCIP

14   association dues through March 2007 (*id.* Ex. 22), and even paid SCIP dues in 2008 after

15   Plaintiffs' ouster (*id.* Ex. 23).  In August 2008, however, Mr. Ergas, as SCIP's *gerant*,

16   contacted the Goldens and advised them that as the "owners" of the shares related to

17   Bunglaow # 12, they were responsible for the payment of outstanding SCIP dues.  (Hall

18   Decl. Ex. 18.)  Mr. Ergas informed the Goldens that, unless they paid the dues that were

19   in arrears within 30 days, the SCIP shares related to Bungalow # 12 would be sold at

20   public auction.  (*Id.*)  In response, the Goldens paid the amount demanded by Mr. Ergas,

21   and have continued to pay SCIP dues since that time.  (Mot. at 11.)

22

1    Following Plaintiffs' ouster, Mr. Golden has described himself and his wife as the

2    owners of Bungalow # 12.  (*See* Jordan Decl. Exs. 1 (M. Golden Dep.) at 170:17-171:4,

3    177:25-178:5; *id*. Exs. 24-25.)  The Goldens also admit that they have explored the idea

4    of selling Bungalow # 12 on at least two occasions in order to recoup some of the

5    association dues they have paid and other expenses they have incurred.[7]  (Hall Decl. Ex.

6    1 (M. Golden Dep.) at 165:17-25; Jordan Decl. Ex. 1 (M. Golden Dep.) at 166:1-25.)

7    Thus, they have asserted ownership rights with regard to the bungalow.

8        Plaintiffs filed suit against the Goldens in the United States District Court for the

9    Western District of Virginia on January 27, 2009, asserting claims including breach of

10   the 1987 Agreement.  (*See* Compl. (Dkt. # 1) ¶ 52.)  On December 31, 2009, the Virginia

11   court dismissed the action for lack of personal jurisdiction over the Goldens.  (*Id.* Ex. G.)

12   On April 30, 2010, Dr. Putz and Panonia filed the present action against the Goldens and

13   SCIP in the Western District of Washington.  (*See generally id*.)

14   ### III.  ANALYSIS

15   **A.  Standards**

16       Summary judgment is appropriate if the evidence, when viewed in the light most

17   favorable to the non-moving party, demonstrates "that there is no genuine dispute as to

18   any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

19   P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*,

20   

21       [7] Ms. Golden has testified that they would have shared any excess proceeds from any sale

22   of the SCIP shares with Dr. Putz.  (Hall Decl. Ex. 3 (S. Golden Dep.) at 40:6-41:6.)

1    477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing

2    there is no genuine issue of material fact and that he or she is entitled to prevail as a

3    matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets his or her burden,

4    then the non-moving party "must make a showing sufficient to establish a genuine

5    dispute of material fact regarding the existence of the essential elements of his case that

6    he must prove at trial" in order to withstand summary judgment.  *Galen*, 477 F.3d at 658.

7    The court is "required to view the facts and draw reasonable inferences in the light most

8    favorable to the [non-moving] party."  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

9    **B.  The Statute of Limitations, the Discovery Rule, and Equitable Tolling**

10        The Goldens assert that Plaintiffs' claims for negligent misrepresentation and

11   breach of contract are barred by the statute of limitations.  (Mot. at 13-18, 19-20.)  A

12   three-year statute of limitations applies to Plaintiffs' claim for negligent

13   misrepresentation.  RCW 4.16.080.  The statute of limitations in Washington for breach

14   of contract is six years.  RCW 4.16.040(1).  Dr. Putz and Panonia respond that either the

15   discovery rule or equitable tolling applies to prevent the statutes of limitations from

16   barring either claim.[8]

17        **1.  Negligent Misrepresentation**

18        The accrual of a cause of action for negligent misrepresentation is subject to the

19   discovery rule.  *Sabey v. Howard Johnson & Co.*, 5 P.3d 730, 739 (Wash. Ct. App. 2000).

20   Under the discovery rule, the statute of limitations does not begin to run until a plaintiff

21   _____

22        [8] Without engaging in an extensive choice of law analysis, both parties apply Washington law to the statute of limitations issue.  (*See* Mot. at 12; Resp. at 11, 13.)

1    discovers or reasonably could have discovered all the essential elements of the cause of

2    action.  *See Allyn v. Boe*, 943 P.2d 364, 372 (Wash. Ct. App. 1997).  The discovery rule

3    requires that "when a plaintiff is placed on notice by some appreciable harm occasioned

4    by another's wrongful conduct, the plaintiff must make further diligent inquiry to

5    ascertain the scope of the actual harm.  The plaintiff is charged with what a reasonable

6    inquiry would have discovered."  *1000 Virginia Ltd. P'ship v. Vertecs Corp*., 146 P.3d

7    423, 431 (Wash. 2006) (citing *Green v. A.P.C.*, 960 P.2d 912, 916 (Wash. 1998)).

8         Dr. Putz and Panonia have alleged that the Goldens negligently misrepresented

9    that they would transfer the SCIP shares representing Bungalow # 12 to Plaintiffs, and

10   that they would arrange for approval of the transfer by the SCIP Board.  (Compl. ¶¶ 69-

11   76.)  Plaintiffs have alleged that the Goldens made these representations at the time the

12   1987 Agreement was executed (*see id*. ¶¶ 23-24, 28, 30), and again in 2005 at the time

13   that Mr. Golden executed his affidavit to assist Dr. Putz in the French Polynesian

14   litigation (*see id*. ¶¶ 42-43).  Plaintiffs did not file suit in Virginia until 2009 (*id*. ¶ 52),

15   and did not file the present suit until 2010.  Plaintiffs assert that despite the three-year

16   statute of limitations, their claims for negligent misrepresentation are not barred because

17   they did not discover the Goldens' misrepresentations until May 2007, when the Goldens

18   refused to execute a power of attorney that would have allowed Plaintiffs access to

19   Bungalow # 12 following their ouster by SCIP.  (Resp. at 20.)

20        The Goldens assert, however, that Dr. Putz either knew or should have known that

21   there might be a problem with Panonia's ownership of SCIP shares long before May

22   2007.  (Mot. at 19-20; Reply at 9-10.)  First, the Goldens assert that, by virtue of his

ORDER- 14

1  position as *gerant*, Dr. Putz had access to SCIP corporate documents and that these

2  documents would have allowed him to determine the status of Panonia as a SCIP

3  shareholder.  (Reply at 10.)  The Goldens argue that Dr. Putz's August 5, 2000 letter to

4  Mr. Cavalli, which references the corporate records of SCIP, is an admission that Dr.

5  Putz had access to those records.  (*Id.* at 9-10; Supp. Hall Decl. Ex. C.)  First, viewing the

6  evidence and inferences in the light most favorable to Plaintiffs, Dr. Putz's statement in

7  the August 5, 2000 letter does not establish that he had general access to SCIP corporate

8  records.  Even if he did have such access, the Goldens have failed to produce evidence

9  that these records necessarily would have put Dr. Putz on notice of their alleged

10  misrepresentations.  In addition, Dr. Putz has expressly testified that despite his authority

11  as *gerant* to access SCIP records, SCIP's bookkeepers or accountants refused to grant

12  him that access.  (Jordan Decl. Ex. 7 (Putz Dep.) at 159:24-160:25.)

13         Next, the Goldens argue that because "Panonia stood in exactly the same position

14  as the California corporation owned by Mr. Cavalli, Dr. Putz's August 17, 2000 letter

15  indicating that the California corporation could not become an owner of SCIP shares

16  without approval of the French Polynesian government is evidence that Dr. Putz was on

17  notice concerning potential problems with Panonia's ownership of SCIP shares.  (Mot. at

18  19-20.)  As discussed above, however, the French Polynesian law concerning the

19  requirements for foreign ownership of real estate or real estate shares changed in 1990,

20  after Panonia became the owner of SCIP shares representing Bunglaow # 12, but before

21  Dr. Putz wrote his August 17, 2000 letter to Mr. Cavalli concerning Mr. Cavalli's

22  California corporation.  (*See* Leou Decl. ¶ 5.)  Thus, Plaintiffs assert that Panonia and the

ORDER- 15

1    California corporation did not stand in the same position, and accordingly Dr. Putz's

2    August 17, 2000 letter does not demonstrate that he was on notice concerning the

3    Goldens' alleged misrepresentations.  (Resp. at 14-15.)

4         Finally, the Goldens assert that Mr. Ergas's August 2003 transmission of a SCIP

5    withdrawal form to Dr. Putz, which "listed the Goldens as the owners of shares # 223-

6    241" should have put Dr. Putz on notice that he might have a problem with Panonia's

7    ownership of the shares.  (Mot. at 20.)  Contrary to the Goldens' assertions, however, the

8    form does not list the Goldens as the owners of shares ## 223-241.  Rather, it lists the

9    Goldens as the "Representative [sic] of the Company" that owns the shares.  (Hall Decl.

10   Ex. 15.)  By listing the Goldens rather than Dr. Putz, the form may have been in error

11   concerning Panonia's proper representative, but the form does not expressly state any

12   error concerning Panonia's ownership of the shares.  Indeed, the form does not explicitly

13   reference "Panonia" at all, but simply refers to "the Company."  (*See id.*)

14        In addition to the error listing the Goldens as the representative of the company

15   owning the shares affiliated with Bungalow # 12, the form is also in error concerning the

16   SCIP share numbers associated with Bunglow # 12.  (*See id.*)  The form lists the share

17   numbers as ## 216-222, instead of ## 223-241.  (*See id.*)  Accordingly, viewing the

18   evidence in the light most favorable to Dr. Putz, one could conclude that the SCIP

19   representative who filled out the form simply did a sloppy job.  Viewed in this light, the

20   court cannot conclude that the form necessarily placed Dr. Putz on notice that there was

21   any question concerning Panonia's ownership of Bunglaow # 12.

22

ORDER- 16

1    Dr. Putz has also argued that the errors on the form should be viewed in light of

2    the contentious relationship between Dr. Putz and Mr. Ergas.  (Resp. at 12, 15.)  In this

3    light, one might conclude that the errors were simply an attempt by Mr. Ergas to erect

4    roadblocks with respect to Plaintiffs' request to withdraw from SCIP.  (*Id.* at 15-16

5    (citing Jordan Decl. Ex. 7 (Putz Dep.) at 97:10-17).)  In other words, one could

6    reasonably view the errors on the withdrawal form as a sort of "tit for tat" with regard to

7    Dr. Putz's earlier opposition to Mr. Ergas's remodel of his bungalow or Dr. Putz's earlier

8    opposition to the withdrawal of other shareholders.  Based on the foregoing, the court

9    concludes that there are numerous material issues of fact concerning whether Dr. Putz

10   and Panonia were on inquiry notice prior to May 2007 concerning the Goldens' alleged

11   misrepresentations.  Accordingly, the court denies the Goldens' motion for summary

12   judgment dismissing Plaintiffs' claims for misrepresentation based on expiration of the

13   statute of limitations.

14       **2.   Breach of Contract**

15       As indicated in the court's previous order denying the Goldens' motion to dismiss,

16   the discovery rule is not available under Washington law with respect to Plaintiffs'

17   breach of contract claims.  (Order (Dkt. # 35) at 26 n.13 (citing *1000 Virginia Ltd.*

18   *P'Ship*, 146 P.3d at 430-31 (recognizing the narrow exception to general rule that

19   discovery rule does not apply to breach of contract claims for contract claims involving

20   latent construction defects)).)  Equitable tolling, however, is available under appropriate

21   circumstances to extend the statutory period with respect to breach of contract claims.

22   "Equitable tolling is a legal doctrine that allows a claim to proceed where justice requires,

1    even though it would normally be barred by the statute of limitations." *Trotzer v. Vig*,

2    203 P.3d 1056, 1062 n.9 (Wash. Ct. App. 2009).  Both the Goldens and Plaintiffs assert

3    that to invoke equitable tolling, Plaintiffs must show (1) bad faith, deception, or false

4    assurances by the defendant, and (2) the exercise of diligence by the plaintiff.  (Resp. at

5    13 (citing *Trotzer*, 203 P.3d at 1062); Mot. at 13 (citing *Trotzer*, 203 P.3d at 1062).)

6         The parties spend much of their briefing discussing whether the Plaintiffs have

7    demonstrated that the Goldens acted in bad faith or made false assurances to Dr. Putz.

8    Plaintiffs assert that the Goldens made false assurances to Dr. Putz in 1987 concerning

9    whether (1) the Goldens complied with SCIP governing statutes for the share transfer, (2)

10   the Goldens obtained SCIP management approval for the share transfer, and (3) Mr.

11   Girard had authority to execute a *cession de parts*.  (*See* Resp. at 13-14.)  In addition,

12   Plaintiffs assert that Mr. Golden executed an affidavit in 2005 in which he again falsely

13   assured Dr. Putz that the Goldens had obtained SCIP management approval for the share

14   transfer.  (*Id.* at 14.)

15        Based on *Trotzer*, the Goldens assert that Plaintiffs cannot demonstrate the

16   necessary predicates for equitable tolling, namely that the Goldens issued any false

17   assurances to Plaintiffs.  (Mot. at 14.)  In *Trotzer*, the court found, following a bench trial,

18   that the assurance the Defendants had given to Plaintiff in a notarized letter that they

19   would "never do any work near the property line without first consulting [Plaintiff]" was

20   not false because Defendants had in fact consulted with Plaintiff prior to commencing

21   work.  203 P.3d at 1062.  The procedural posture of this matter is significantly different

22   than in *Trotzer*.  In *Trotzer*, the court determined that the defendants' assurances were not

1    false following a bench trial.  Here, the parties are moving for summary judgment.  At

2    this stage in the proceedings, unlike in *Trotzer*, the court cannot conclude that there are

3    no material issues of fact concerning whether the Goldens' alleged assurances to Dr. Putz

4    in 1987 and 2005 were false.

5         The Goldens also argue that Plaintiffs cannot meet the second element of equitable

6    tolling – namely, that they exercised diligence in pursuing their claims.  (Mot. at 14-15.)

7    The Goldens cite all of the same evidence with respect to Plaintiffs' alleged lack of

8    diligence that they cite with respect to their argument that Plaintiffs were placed on

9    inquiry notice and thus not entitled to tolling under the discovery rule.  (Mot. at 14-16;

10   Reply at 4-6.)  As the court discussed above, there are numerous issues of fact with

11   respect to these issues preventing summary judgment.  (*See supra* § III.B.1.)

12        Further, there is substantial evidence in the record indicating that Plaintiffs have

13   not sat on their rights.  Although the present state of the French Polynesian litigation

14   between SCIP and Plaintiffs is unclear and disputed, there is no dispute that Plaintiffs

15   initiated and pursued their claim against SCIP in French Polynesia.[9]  (*See* Jordan Decl.

16   Ex. 7 (Putz Dep.) at 94:3-4; Ex. 16.)  In addition, following their ouster from Bungalow #

17   12 in 2007, and the Goldens' refusal to execute a power of attorney that would have

18   enabled Plaintiffs to regain access to the Bungalow, Plaintiffs filed suit against the

19   Goldens in 2009 in the Western District of Virginia.  (*See* Hall Decl. Ex. 24.)  When the

20   _____

21        [9] Plaintiffs assert that they did not pursue litigation against the Goldens at this time
     because they relied upon the Goldens' assurances that they had properly transferred the
22   shares.  (*See* Resp. at 14.)

1   Virginia court dismissed the action for lack of personal jurisdiction on December 31,

2   2009 (*see id.*), Plaintiffs re-filed just four months later in the Western District of

3   Washington.[10]  (*See generally* Compl. (filed on April 30, 2010).)  Accordingly, based on

4   the test for equitable estopple articulated by the Washington Court of Appeals in *Trotzer*,

5   the court denies the Goldens' motion for summary judgment dismissing Plaintiffs' breach

6   of contract claim based on the statute of limitations.

7        The court also notes, however, that by citing *Trotzer*, the parties have incorrectly

8   limited the applicability of the doctrine of equitable tolling in Washington.  In October

9   2011, the Washington Supreme Court expressly recognized that the availability of

10  equitable tolling of the statute of limitations is not limited to circumstances "where one of

11  the predicates of bad faith, deception, and false assurances [i]s shown."  *In re Pers.*

12  *Restraint of Carter*, 263 P.3d 1241, 1247 (Wash. 2011).  In *In re Personal Restraint of*

13  *Bonds*, 196 P.3d 672 (Wash. 2008), the Court's plurality held that equitable tolling did

14  not apply because "the petitioner failed to show that his untimely filing was caused by

15  another's bad faith, deception, or false assurances."  *Carter*, 263 P.3d at 1247 (citing

16  *Bonds*, 196 P.3d at 676).  A two-Justice concurrence, however, would not have limited

17  the application of equitable tolling to situations involving one of these predicates.  *Id.*

18  (citing *Bonds*, 196 P.3d at 677-78 (Alexander, C.J., concurring)).  Further, the three-

19  Justice dissent stated that it would have held that equitable tolling was available "when

20  ─────────────────

21  [10]Courts have applied the doctrine of equitable estopple to toll the limitations period
    during a plaintiff's pursuit of a remedy in another forum, where the prior action was discontinued
22  due to lack of personal jurisdiction. *See, e.g.*, *Island Insteel Syss., Inc. v. Waters*, 296 F.3d 200,
    204-05 (9th Cir. 2002); *Mayes v. Leipziger*, 729 F.2d 605, 606 (9th Cir. 1984).

1   justice requires it." *Id.* (citing *Bonds*, 196 P.3d at 678 (Sander, J., dissenting)).

2   Accordingly, in *Carter*, the Washington Supreme Court recognized that the doctrine of

3   equitable tolling applies more broadly than Washington case law may have indicated

4   previously.  263 P.3d at 1247-48.

5          Based on the broader test articulated in *Carter*, the court also finds that the present

6   circumstances preclude summary judgment in favor of the Goldens.  The equitable

7   circumstances that the court considers are as follows:  In 2007, nearly twenty years after

8   the parties executed an agreement to transfer SCIP shares representing Bungalow #12

9   from the Goldens to Plaintiffs, SCIP ousted Plaintiffs from Bungalow #12 and posted a

10  notice declaring the Goldens as the rightful owners of the shares.  (*See* Jordan Decl. Ex.

11  2.)  There is evidence in the record indicating that by 2008 the Goldens began making

12  statements asserting their personal ownership of the SCIP shares once again, and the

13  Goldens admit that they have had access to and the opportunity to use the bungalow.

14  (*See, e.g.*, Jordan Decl. Ex. 1 (M. Golden Decl. at 186:15-187:6; *id.* Exs. 24, 25.)

15  Nevertheless, Mr. Golden also admits that Dr. Putz fully performed on his obligations

16  under the 1987 Agreement, and paid the contract price for the SCIP shares to the

17  Goldens.  (*Id.* at Ex. 1 (M. Golden Dep.) at 124:19-126:2.)  He has also admitted that he

18  and his wife no longer have a right to retain the money Plaintiffs paid for Bungalow # 12.

19  (*Id.* Ex. 1 at 178:6-15.)  The equitable issue of concern to the court is that twenty years

20  after Plaintiffs paid for the SCIP shares, the Goldens not only have effective possession

21  of Bungalow #12 once again, but have retained the purchase price paid by Plaintiffs as

22  well, despite acknowledging that they have no right to do so.  Although the record is

1    incomplete, the forgoing circumstances raise factual issues sufficient to defeat summary

2    judgment in favor of the Goldens with respect to the statute of limitations.  The court

3    finds that Plaintiffs have raised a triable issue of fact concerning equitable tolling.

4    **C. Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing**

5        The Goldens assert that they are entitled to summary judgment with respect to the

6    breach of contract claim "because there is no dispute of material fact that the Goldens did

7    what they promised to do."  (Mot. at 16.)  The court, however, views the evidence and all

8    reasonable inferences in the light most favorable to Plaintiffs.  *Scott*, 550 U.S. at 378.  As

9    recited in the "Background" portion of this order, there are myriad material factual

10   disputes concerning the Goldens' performance under the 1987 Agreement.  (*See supra* §

11   II.)  Accordingly, the court denies the Goldens' motion for summary judgment of

12   Plaintiffs' claim for breach of contract.

13       In addition, the Goldens also move for summary judgment of Plaintiffs' claim for

14   breach of the implied covenant of good faith and fair dealing, arguing simply that

15   because they were entitled to summary judgment of Plaintiffs' breach of contract claim,

16   they are also entitled to summary judgment of this related claim.  (Mot. at 18-19.)  In

17   Washington, every contract carries with it an implied covenant of good faith and fair

18   dealing that obligates the parties to cooperate with one another so that each may obtain

19   the full benefit of performance.  *Frank Coluccio Constr. Co., Inc. v. King County*, 150

20   P.3d 1147, 1154 (Wash. Ct. App. 2007) (citing *Badgett v. Sec. State Bank*, 807 P.2d 356,

21   360 (Wash. 1991)).  The duty, however, exists only in relation to performance of a

specific contract term; there is no "'free-floating' duty of good faith and fair dealing that

is unattached to an existing contract." *Keystone Land & Dev. Co. v. Xerox Corp.*, 94

P.3d 945, 949 (Wash. 2004) (quoting *Badgett*, 807 P.2d at 360).  If the court had granted

the Goldens' motion for summary judgment with respect to Plaintiffs' contract claim,

then the Goldens' argument concerning their alleged breach of the duty of good faith may

have succeeded.  The court, however, has denied summary judgment with respect to

Plaintiffs' contract claim, and without more, denies summary judgment with respect to

this claim, as well.

### D.  Negligent Misrepresentation

The essential elements of the tort of negligent misrepresentation in Washington

are:  (1) the defendant supplied information for the guidance of others in their business

transactions that was false, (2) the defendant knew or should have known that the

information was supplied to guide the plaintiff in his or her business transactions, (3) the

defendant was negligent in obtaining or communicating the false information, (4) the

plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and

(6) the false information proximately caused the plaintiff damages.  *Ross v. Kirner*, 172

P.3d 701, 704 (Wash. 2007) (citing *Lawyers Title Ins. Corp. v. Baik*, 55 P.3d 619, 623

(Wash. 2002)).  "The proof of such a claim must be clear, cogent, and convincing." *Van*

*Dinter v. Orr*, 138 P.3d 608, 609 (Wash. 2006) (quoting *Havens v. C & D Plastics, Inc.*,

876 P.2d 435, 447 (Wash. 1994)).

The Goldens assert that they did obtain SCIP approval for the transfer of shares to

Panonia in 1987, and thus any statements they made to that effect at or about the time the

1    parties executed the 1987 Agreement or in the 2005 affidavit were not false.  (Mot. at

2    20.)  As described above in the "Background" portion of this order, however, there are

3    numerous material factual disputes concerning the Goldens' performance under the 1987

4    Agreement (*see supra* § II), and those same factual disputes would apply in determining

5    whether the Goldens' various statements concerning their contractual performance were

6    false or not.

7            The Goldens also assert that, even if statements in the 2005 affidavit were false,

8    Plaintiffs cannot prove that the affidavit caused them any damages.  (Mot. at 20-21.)  The

9    court, however, cannot conclude that there are no triable issues of fact concerning

10   damages related to the 2005 affidavit.  A reasonable trier of fact could conclude that Mr.

11   Golden's affidavit delayed Plaintiffs' discovery of the actual source of the problem with

12   regard to Panonia's title of the SCIP shares.  The resulting delay would necessarily

13   extend the period of time for which Plaintiffs were deprived of the use of the purchase

14   price they paid in 1987, as well as the period of time for which Plaintiffs were required to

15   pay maintenance costs and other fees on a property for which they did not hold clear title.

16   Accordingly, the court denies the Goldens' motion for summary judgment with respect to

17   Plaintiffs' negligent misrepresentation claim.

18           **E.  Trespass**

19           The Goldens assert that Plaintiffs have no claim for trespass against them because

20   it was SCIP that ousted Plaintiffs from Bungalow # 12 and not the Goldens.  (Mot. at 21.)

21   Although this may be true, it is an incomplete picture of the factual record.  SCIP ousted

22   Plaintiffs based on its assertion that the Goldens were the true owners of Bungalow # 12.

1    (Jordan Decl. Exs. 2, 5.)  Following their ouster by SCIP, Plaintiffs notified the Goldens

2    and sought their assistance in regaining access to Bunglaow # 12 by asking the Goldens

3    to execute a power of attorney.  (*Id.* Exs. 2, 3.)  The Goldens declined to execute the

4    power of attorney, and continue to refuse Plaintiffs access to the bungalow.  (*Id.* Ex. 1

5    (M. Golden Dep.) at 188:22-189:9, 191:6-24, 193:16-195:12.)  When asked whether he

6    considered himself to the owner of Bungalow # 12, Mr. Golden testified that "[a]ccording

7    to SCIP, yes."  (*Id.* Ex. 1 at 170:17-19.)  The Goldens have access to and the opportunity

8    to use Bungalow #12 (*id.* Ex. 1 at 186:17-187:6) and have considered selling it on at least

9    two occasions since Plaintiffs' ouster (*id.* Ex. 1 at 166:1-167:15; Hall Ex. 1 (M. Golden

10   Dep.) at 165:17-25).  The court agrees with Plaintiffs that these facts, when viewed in a

11   light most favorable to Plaintiffs, raise genuine issues of material fact supporting a claim

12   for trespass on Plaintiffs' rights with respect to Bungalow # 12.  Accordingly, the court

13   denies the Goldens' motion for summary judgment on this claim.

14   **F.  Intentional Interference with Business Expectancy**

15        The Goldens' argument with respect to Plaintiffs' claim for intentional

16   interference with business expectancy is the same one the court previously rejected in

17   denying Plaintiffs' motion to dismiss.  (Order at 32-33.)  The court reaches the same

18   result when considering the argument under a summary judgment standard.  The Goldens

19   argue that Plaintiffs' claim should be dismissed because a party to a contract cannot be

20   liable in tort for breaching its own contract.  (Mot. at 22 (citing *Houser v. Redmond*, 559

21   P.2d 577, 580 (Wash. Ct. App. 1977), *aff'd*, 586 P.2d 482 (Wash. 1978)).)  It is not,

22   however, the 1987 Agreement with which Plaintiffs' argue the Goldens have interfered.

1    Rather, Plaintiffs argue that the Goldens' have taken exclusive possession of Bungalow #

2    12, and prevented Plaintiffs from renting it to others.  (Resp. at 22.)  While he was in

3    possession of Bungalow # 12, Dr. Putz frequently rented it to others.  Indeed, there is

4    evidence that he rented it "continuously" or "permanently." (Jordan Decl. Ex. 1 (M.

5    Golden Dep.) at 191:25-192:13; *id.* Ex. 5.)  "A valid business expectancy includes any

6    prospective contractual or business relationship that would be of pecuniary value."

7    *Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Group, Inc.*, 52 P.3d 30, 33

8    (Wash. Ct. App. 2002).   Following his ouster by SCIP, Dr. Putz sought assistance from

9    the Goldens in an attempt to maintain his ability to rent the bungalow.  He asked the

10   Goldens to execute a power of attorney that would enable him to rent the bungalow even

11   after his ouster, but the Goldens refused.[11]  (*Id.* at 192:20-195:12.)  It is the "rental

12   expectancy" from third parties with which Plaintiffs assert the Goldens have tortiously

13   interfered, and not the 1987 Agreement to which the Goldens were parties.  (Resp. at 22-

14   23.)  Viewing the evidence in the light most favorable to Plaintiffs, the court denies the

15   Goldens' motion for summary judgment with respect to Plaintiffs' claims for tortuous

16   interference with a business expectancy.

17

18

19

20        [11] The Goldens assert that they refused because the power of attorney was not sufficiently

21   limited, while Dr. Putz asserts that its purpose was limited solely to enabling him to rent the
     bungalow to others.  (*See, e.g.*, Jordan Decl. Ex. 1 (M. Golden Dep.) at 194:10-195:12; *id.* Ex.

22   3.)  The Goldens have also declined to rent the bungalow to others themselves.  (*Id.* Ex. 1 at
     195:17-196:5.)

1    **G.  Declaratory Judgment**

2        The Goldens assert that Plaintiffs' claim for declaratory judgment should be

3 dismissed on summary judgment based on all of the same grounds asserted with respect

4 to Plaintiffs' underlying claims as discussed above.  (Mot. at 22.)  Because the court has

5 denied the Goldens' motion with respect to the underlying causes of action, it also denies

6 the Goldens' motion with respect to Plaintiffs' claim for declaratory relief.

7                             **IV.  CONCLUSION**

8        For the foregoing reasons, the court DENIES the Goldens' motion for summary

9 judgment (Dkt. # 45).

10        Dated this 24th day of January, 2012.

11

12

13                            _____

                            JAMES L. ROBART

14                             United States District Judge

15

16

17

18

19

20

21

22

ORDER- 27