1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   HERBERT R. PUTZ, et al.

11                              Plaintiffs,

12                  v.

13   MICHAEL H. GOLDEN, et al.

14                              Defendants.

CASE NO. C10-0741JLR

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

15          This matter came for trial on February 21-23, 2012, before the court sitting

16   without a jury.  (*See* Min. Entries (Dkt. ## 64-66); Tr. Trans. (Dkt. ## 80-82).)  Plaintiffs

17   Panonia Corporation ("Panonia") and Dr. Herbert R. Putz were represented at trial by

18   Steven Fogg and Christina Dimock of Corr Cronin Michelson Baumgardner & Preece

19   LLP.  Defendants Michael H. Golden and Suzanne C. Golden ("the Goldens") were

20

21

22

ORDER- 1

1  represented by Howard I. Hall of Wolfstone, Panchot & Bloch, P.S., Inc.[1]  The court also

2  sought and received post trial briefing and declarations concerning Panonia's tax returns

3  from 1987-2006, which Panonia did not produce until after the second day of trial (*see*

4  Dkt. ## 68, 69, 71, 74).  In addition, the court sought and received additional briefing on

5  damages issues (*see* Dkt. ## 79, 83, 84).[2]  The court has considered the testimony

6  presented at trial, the exhibits admitted into evidence, properly filed post-trial

7  memorandum and declarations, and the arguments of counsel.  The court has weighed the

8  testimony, exhibits, and other evidence using the required "preponderance of the

9  evidence" standard, except with respect to Plaintiffs' claims for negligent

10  misrepresentation and Defendants' request for the imposition of a constructive trust

11  where the court has considered the evidence using the required "clear, cogent, and

---

[1] Plaintiffs also sued Defendant Societe Civile Immobiliere Paepaepupure ("SCIP"), but SCIP has never appeared in this action.  An order granting Plaintiffs' motion of default against SCIP was entered on December 21, 2010.  (Order of Default (Dkt. # 39).)  Plaintiffs' motion for default judgment against SCIP is presently pending.  (Mot. Def. Judg. (Dkt. # 93).)

The Goldens have filed counterclaims against Plaintiffs (Ans. (Dkt. # 41) at 15-21), cross-claims against SCIP (*id.* at 16-23), and third-party claims against Claude Girard (*id.* at 23-25).  Like SCIP, Mr. Girard has never appeared in this action.  The Goldens responded to an order to show cause (Dkt. # 90) acknowledging that they had failed to prosecute their claims against SCIP and Mr. Girard.  (*See* 6/26/12 Resp. (Dkt. # 94).)  Accordingly, the court has entered an order dismissing without prejudice the Goldens' claims against both SCIP and Mr. Girard for lack of prosecution.  (6/26/12 Order (Dkt. # 96).)

[2] In response to the court's April 5, 2012 order to show cause regarding certain issues related to damages (Dkt. # 79), Plaintiffs submitted an additional declaration in response to the court's order.  (*See* Dkt. # 85.)  The Goldens objected to this declaration as improper supplementation of the factual record.  (*See* Dkt. # 86.)  The court's April 5, 2012 order to show cause authorized the filing of additional briefing; it did not authorize supplementation of the trial's factual record.  (*See generally* 4/5/12 OSC (Dkt. # 79).)  The court, therefore, agrees that the declaration was improperly filed.  Accordingly, the court has not considered Plaintiffs' additional declaration in issuing the findings of fact and conclusions of law contained herein.

convincing" standard.  Now, the court, being fully advised, makes the following Findings

of Fact and Conclusions of Law[3]:

# I.       FINDINGS OF FACT

## A. The Parties

1.   Dr. Putz is a resident of Virginia.  (Compl. ¶ 14.)  Panonia is a corporation

formed under the laws of New York with its principal place of business in Virginia.  (*See*

Ex. 2; Compl. (Dkt. # 1) ¶ 15.)  Dr. Putz is the President of Panonia.

2.   The Goldens are currently residents of Bellevue, Washington.  (2/22/12 Tr.

Trans. (Dkt. # 81) at 66:23-67:1.)  From approximately 1965 through 1981, Dr. Golden

was a practicing dentist – first in the Navy, followed by private practice in California.

(*Id.* at 65:11-67:4.)  In 1981, the Goldens moved to Bellingham, Washington, and Dr.

Golden left the practice of dentistry and went into real estate.  (*Id.* at 67:2-7.)  Dr. Golden

obtained his Realtor's license, and bought, sold, and developed property.  (*Id.* at 67:8-11.)

Although he is semiretired today, he continues to work in real estate.  (*Id.* at 67:12-17.)

3.   SCIP is an organization formed under the laws of French Polynesia.  (*See* Exs.

8, A-108.)  SCIP did not appear at trial.  Plaintiffs' motion for default judgment against

SCIP is presently pending.  (Mot. for Def. Judg.)

---

[3] To the extent any findings of fact may be deemed conclusions of law, they shall also be
considered conclusions.  Similarly, to the extent any conclusions as stated may be deemed
findings of fact, they shall also be considered findings.  *See In re Bubble Up Delaware, Inc*., 684
F.2d 1259, 1262 (9th Cir. 1982).

1    4.  Third-party defendant Claude Girard is a citizen of French Polynesia.  (*See*

2 Ans. at 23.)  Mr. Girard did not appear at trial, and the Goldens' claims against him have

3 been dismissed without prejudice.

4    **B.  Credibility Determinations**

5    5.   The court already has found that Dr. Putz's testimony lacks credibility based

6 on his demonstrably false testimony at trial concerning Plaintiffs' use of the bungalow as

7 a rental property and the rental income Plaintiffs derived from the bungalow.  (5/22/12

8 Order (Dtk. # 87) at 14-15.)  The court will not repeat its entire rationale for finding that

9 Dr. Putz's testimony lacks credibility here, but incorporates by reference the findings

10 contained within its May 22, 2012 order with respect to the Goldens' motion for

11 sanctions.  (*See generally* Ord. re: Sanctions (Dkt. # 87).)  Thus, to the extent that Dr.

12 Putz's testimony conflicts with the testimony of other witnesses, the court credits the

13 testimony of the other witnesses, rather than Dr. Putz's testimony.

14    6.  The court finds that, although the Goldens are defendants in this action, and

15 therefore, by definition, interested parties, their testimony is credible.

16    7.  The court finds that, other than a reasonable expert witness fee (*see* 2/22/12 Tr.

17 Trans. (Dkt. # 81) at 102:12-18), Marie Joseeleou has no stake in the outcome of this

18 litigation, and her testimony is credible.

19    8.  The court finds that, although Michael Cavelli has had an acrimonious

20 relationship with Dr. Putz over the years, his testimony is credible.

21

22

**C. The SCIP Development in French Polynesia**

9.   SCIP is a real estate development, consisting of 16 bungalows, located in Paepaepupure on the island of Bora Bora in French Polynesia.  (2/21/12 Tr. Trans. (Dkt. # 80) at 13:6-14:5.)  SCIP was originally developed in the 1970's.  (*See* Exs. 8, A-108.)

10.  Each owner of SCIP shares has the right to use a particular bungalow represented by a particular set of SCIP shares.  (2/21/12 Tr. Trans. at 16:6-15.) Ownership of SCIP shares does not include title to the underlying real estate.  (*Id.* at 130:12-20, 131:2-8.)  Ownership of SCIP shares includes the right to rent out the bungalow associated with the SCIP shares.  (*See id.* at 37:10-12, 130:12-21; *see also* 2/22/12 Tr. Trans. at 72:6-24.)

11.  The 16 SCIP bungalows are all of equal size.  (2/22/12 Tr. Trans. at 17:25-18:7.)

12. SCIP is governed by "statutes" which are analogous to articles of incorporation.  (*See* Ex. 8.)  Under the statutes, management of SCIP is placed in the hands of a manager, known as a *gerant* in French.  (2/21/12 Tr. Trans. at 34:8:-12.)  The *gerant's* responsibilities include approving the sale of shares to a third party.  (*Id.* at 17:18-20.)

13.  In addition to the *gerant*, SCIP also has a "supervisory committee" made up of three SCIP shareholders, or "associates."  (Ex. 8 at 35-36.)  SCIP had no board of directors, per se, although members of the supervisory committee informally referred to themselves as SCIP's "board."

**D.  The Goldens' Purchase of SCIP Shares Representing Bungalow # 12**

14.  In 1978, the Goldens purchased certain SCIP shares for $125,000.00.  (2/22/12 Tr. Trans. at 70:1-12.)  The SCIP shares purchased by the Goldens represented the right to use Bungalow # 12 within the SCIP development.  (*Id.*; *see* 2/21/12 Tr. Trans. at 130:12-22.)

15.  As part of the transaction, the Goldens received a formal "*cession de parts*," which is a legal document in French Polynesia that recorded their acquisition of the SCIP shares representing Bungalow # 12.  (2/22/12/ Tr. Trans at 70:13-21; Ex. 5.)

**E.  Dr. Golden's Service as a Member of SCIP's Supervisory Committee**

16.  After purchasing the SCIP shares associated with Bunglaow # 12, Dr. Golden became involved in SCIP as a member of the SCIP supervisory committee or "board," along with Rosette Valente and Norton Brown.  (*See* 2/21/12 Tr. Trans. at 18:1-4; 2/22/12 Tr. Trans. at 73:19-74:5, 74:13-14, 133:7-11.)  Mr. Brown was a certified public accountant and a principal in the Los Angeles, California firm of Brown & Kraft.  (*See* 2/21/12 Tr. Trans. at 18:1-4; 2/22/12 Tr. Trans. at 77:16.)

17.  During the time period that Dr. Golden was involved in the management of SCIP's affairs, Mr. Brown served as SCIP's *gerant*.  (2/22/12 Tr. Trans. at 73:24-74:2; 76:6-14.)  Mr. Brown also maintained SCIP's records.  (2/21/12 Tr. Trans. at 152:23-25; 2/22/12 Tr. Trans. 78:6-8.)

**F.  The 1987 Contract between Dr. Putz and the Goldens**

18.  In 1987, the Goldens decided to sell their SCIP shares to Dr. Putz.  The Goldens and Dr. Putz entered into a two-page purchase and sale agreement, drafted by Mr. Golden and dated February 23, 1987, and a one-page addendum signed by Dr. Putz on March 5, 1987 and by the Goldens on March 29, 1987 (the "1987 Agreement").  (Ex. 1; 2/21/12 Tr. Trans. at 18:18-19:14; 130:1-11.)  Dr. Putz drafted the one-page addendum.  (2/21/12 Tr. Trans. at 130:9-11, 136:13-16.)

19.  The 1987 Agreement pertains to the SCIP shares relating to Bungalow # 12, and provides for the Goldens to transfer those shares to Dr. Putz or his assigns in exchange for $117,500.00.  (Proposed Pretrial Order (Dkt. # 56) at 3 (Admitted Fact # 1); Ex. 1; 2/22/12 Tr. Trans. at 79:7-9.)

20.  Dr. Putz understood that he was buying shares of SCIP, which entitled him to use Bungalow # 12 for personal use or as a rental, and that he was not buying real property.  (*See* 2/21/12 Tr. Trans. at 130:12-20.)  He also understood that he would have an option in the future to convert his SCIP shares into a deed if he followed certain SCIP procedures and requirements.  (*Id.* at 130:21-22; 131:2-8.)

21.  The first page of the 1987 Agreement requires the Goldens to provide "[t]itle to the property . . . free of all encumbrances."  (Ex. 1 at 1.)

22.  The one-page addendum to the 1987 Agreement includes a paragraph, which states that "Sellers [the Goldens] will arrange that the Board of Directors will approve the transfer of the stocks as required by the By-laws of the Corporation."  (Ex. 1 at 3.)

1    23. Dr. Golden understood the foregoing paragraph of the addendum to mean that

2    he needed to have the approval of the current SCIP board (or supervisory committee)

3    members, which consisted of himself, Ms. Valente, and Mr. Brown.  (2/22/12 Tr. Trans.

4    at 81:3-13, 134:18-135:1.)

5    **G. SCIP Approval of the Sale**

6    24. The by-laws of SCIP are a separate and distinct document from SCIP's

7    statutes.  (*Compare* Ex. 8 *with* Ex. A-108.)

8    25. Dr. Putz's use of the term "By-laws" within the addendum to the 1987

9    Agreement created an ambiguity because SCIP's by-laws do not govern the transfer of

10   SCIP shares.  (*See generally* Ex. A-108.)

11   26. Dr. Putz testified that he used the term "By-laws" loosely in the addendum to

12   include SCIP's statutes as well.  (*See* 2/21/12 Tr. Trans. at 23:25-25:13, 58:4-59:15,

13   62:22-63:16, 139:6-22.)  However, in other contexts, Dr. Putz used the term "statutes"

14   and "by-laws" accurately with regard to SCIP.  (*See* Exs. A-85, A-96, A97, A99.)

15   Further, at the time he drafted the one-page addendum, Dr. Putz had a copy of SCIP's

16   statutes and by-laws in his possession.  (2/21/12 Tr. Trans. at 136:22-137:5, 138:14-

17   139:12.)  Accordingly, the court does not find the forgoing testimony by Dr. Putz to be

18   credible.

19   27. SCIP statutes, but not its by-laws, state that "[n]o share transfer to third parties

20   outside of the Company [SCIP] may take place except by prior consent of the

21   management."  (*See* Ex. 8 at 11.)

22

28. SCIP statutes, but not its by-laws, state that "[w]hen the projected transfer is not free, the transferer must notify the Company [SCIP] of his intentions by registered mail, indicating the last name, first name, place of residence and nationality of the transferee as well as the price of the envisaged transfer." (*See id.* at 12.)

29. SCIP statutes, but not its by-laws, state:

> Within the fifteen days that follow this declaration, the management rules as to the approval or refusal of the person presented as a future shareholder, and the transferer will be immediately notified of its decision by registered card-letter with a request for acknowledgment of receipt.

(*See id.*)

30. SCIP's *gerant* has the authority to approve the transfer of SCIP shares to a third party. (2/21/12 Tr. Trans. at 139:23-141:11.)

31. SCIP's *gerant*, or manager, in 1987 was Mr. Brown. (*Id.* at 131:14-134:20.)

32. At the time of the transaction with Dr. Putz concerning the SCIP shares related to Bungalow # 12, Dr. Golden did not review the SCIP statutes or by-laws, but relied instead on representations from Ms. Valente, Mr. Brown, and Mr. Claude Girard (SCIP's attorney) concerning what was required by SCIP to transfer the shares. (2/23/12 Tr. Trans. (Dkt. # 82) at 35:8-36:6, 37:6-11.)

33. On April 16, 1987, Dr. Golden sent a letter to Mr. Brown and Ms. Valente, the other members of the supervisory committee, informing them of the sale of the Goldens' SCIP shares to Dr. Putz. (2/22/12 Tr. Trans. at 82:2-83:1, 136:9-138:23; Ex. 18.)

34. Dr. Golden did not list Dr. Putz's address or nationality, nor did he list the purchase price of the sale in his April 16, 1987 letter. (2/22/12 Tr. Trans. at 138:24-11;

1  *see* Ex. 18.)  Nevertheless, both Ms. Valente and Mr. Brown were aware of the purchase

2  price.  (2/22/12 Tr. Trans. at 139:5-8.)

3        35.  Dr. Golden did not send his letter by registered mail.  (*Id.* at 137:13-138:23.)

4        36.  Despite the fact that Dr. Golden's letter was not sent by registered mail,

5  neither Mr. Brown nor Ms. Valente raised any concern or objection to the transfer of the

6  shares.  (2/22/12 Tr. Trans. at 86:20-87:3.)

7        37. Dr. Putz admitted that during his subsequent tenure as SCIP's *gerant* if he had

8  received a letter from a SCIP shareholder that under SCIP's statutes was required to be

9  sent by registered mail but was not, he would not have required the sender to post the

10  letter a second time.  (2/21/12 Tr. Trans. at 162:3-9.)

11        38.  At approximately the same time that Dr. Golden sent his April 16, 1987 letter

12  to Ms. Valenta and Mr. Brown, he also notified Mr. Girard, SCIP's lawyer (*id.* at 150:1-

13  2), regarding the transfer of the shares representing Bungalow # 12 to Plaintiffs.  (2/22/12

14  Tr. Trans. at 82:15-83:1; *see* Ex. 18.)

15        39.  Dr. Golden did not receive a "registered card-letter" from SCIP

16  acknowledging the approval of SCIP's management as required by SCIP's statutes**.**  (*See*

17  2/21/12 Tr. Trans. at 67:17-70:1.)  Instead, Ms. Valente and Mr. Brown orally confirmed

18  to Dr. Golden that the transfer of his shares to Dr. Putz was approved by SCIP's

19  management.  (*See* 2/22/12 Tr. Trans. at 141:11-20.)

20  **H. Dr. Putz Forms Panonia**

21        40.  In the summer of 1987, Dr. Putz formed a New York corporation named

22  Panonia that he intended would own the SCIP shares related to Bungalow # 12 as his

ORDER- 10

1   assign.  (2/21/12 Tr. Trans. at 20:6-21:8, 20:21-2, 29:16-18; 30:7-19; Tr. Exs. 2, 3 & 4.)

2   Dr. Putz explained to the Goldens that he was forming Panonia to shield himself from

3   personal liabilities related to the operation of Bungalow # 12.  (2/22/12 Tr. Trans. at 83:2-

4   19.)  Dr. Putz informed the Goldens that he would send them the documents for Panonia,

5   which he asked them to sign and return to him.  (2/21/12 Tr. Trans. at 28:15-20; 29:19-

6   30:19.)

7       41.  Dr. Putz's idea regarding the formation of Panonia was that the Goldens

8   would temporarily own all of Panonia's shares.  (2/21/12 Tr. Trans. at 29:16-21, 146:13-

9   15.)  They would then transfer all of the SCIP shares related to Bungalow # 12 into

10  Panonia.  (*Id.* at 30: 3-6, 146:16-18; Ex. 6.)  Finally, the Goldens would assign their

11  shares in Panonia to Dr. Putz.  (2/21/12 Tr. Trans. at 146:19-23; Ex. 4.)  Dr. Putz would

12  then own Panonia which in turn would own the SCIP shares for Bungalow # 12.  (2/21/12

13  Tr. Trans. at 29:19-30:19; Ex. 3.)

14      42. The Goldens agreed to transfer the SCIP shares to Panonia and then assign the

15  Panonia shares to Dr. Putz as Dr. Putz had requested.  (*See* 2/22/12 Tr. Trans. at 87:6-

16  88:22, 135:19-136:8; Exs. 4, 6.)

17  **I. The Closing of the Sale**

18      43.  In order to close the sale, Dr. Putz agreed to send funds representing the

19  purchase price to Mr. Brown.  (*See* 2/22/12 Tr. Trans. at 85:7-20.)  Mr. Brown, in turn,

20  would send the funds to the Goldens only after Mr. Girard confirmed that the shares had

21  been transferred to Panonia, and that Dr. Putz and Panonia had the right to occupy

22  Bungalow # 12.  (*See* Ex. 12; 2/21/12 Tr. Trans. at 27:12-18, 32:15-33:11.)  In this way,

1    Mr. Brown served as a sort of "middle man" or informal escrow agent with respect to the

2    transaction (*see id.* at 86:8-13; 2/21/12 Tr. Trans. at 32:3-14; Ex. 11), and Mr. Girard

3    served as an informal "closing agent" (2/21/12 Tr. Trans. at 23:20-24).

4         44.  On September 23, 1987, Dr. Golden wrote to Dr. Putz sending him Mr.

5    Brown's address and advising him that Mr. Brown's office was aware of the sale.  (Ex.

6    11.)

7         45.  At the time of the transaction, Dr. Putz understood that Mr. Brown was the

8    *gerant* for SCIP.  (2/21/12 Tr. Trans. at 131:14-134:20.)

9         46.  Dr. Putz sent the $117,500.00 purchase price to Mr. Brown.  (2/21/12 Tr.

10   Trans. at 27:12-18; 2/22/12 Tr. Trans. at 85:7-20.)

11        47.  On or about October 2, 1987, the Goldens assigned their shares in Panonia to

12   Dr. Putz.  (Ex. 4.)

13        48.  In a facsimile letter, Mr. Girard stated to Dr. Putz that "I confirm to you that

14   the stock has been transferred from Mike and Suzanne [Golden] to PANONIA REALTY

15   CO and when you buy the shares of PANONIA you [unclear] the right of occupancy as

16   an ownership of bungalow n* 12."  (Ex. 12.)  Thus, Mr. Girard confirmed that the SCIP

17   shares at issued were transferred from the Goldens.  (2/21/12 Tr. Trans. at 32:15-33:11.)

18        49.  Upon receiving confirmation that the SCIP shares had been transferred, Dr.

19   Putz authorized Mr. Brown to send the purchase price to the Goldens.  (*Id.* at 33:15-18;

20   148:21-25; *see* 2/22/12 Tr. Trans. at 86:13.)

21        50.  Mr. Brown sent the funds representing the purchase price to the Goldens**.**

22   Accordingly, Dr. Putz paid $117,500.00 to the Goldens as required by the 1987

1    Agreement. (2/21/12 Tr. Trans. at 27:12-18.) The Goldens have never returned the

2    purchase price. (Proposed Pretrial Order at 4 (Admitted Fact # 3).)

3        51. Mr. Girard prepared a *cession de parts* formally documenting the transfer of

4    ownership of the SCIP shares related to Bungalow # 12 from the Goldens to Panonia.

5    (2/21/12 Tr. Trans. at 150:1-5; *see* Ex. 8.)

6        52. Every individual involved in overseeing SCIP's affairs in 1987 – Mr. Brown,

7    Ms. Valente, Dr. Golden, and Mr. Girard – was aware of the sale and none raised any

8    objection to it. (2/22/12 Tr. Trans. at 86:20-87:3.) Mr. Brown, who as *gerant* had the

9    authority to approve the transfer of the shares, would not have sent the $117,500.00

10   purchase price onto Dr. Golden if he had not approved of the transfer of shares to

11   Plaintiffs. (*See id.* at 87:4-7.)

12       53. Both the Goldens and Dr. Putz believed that the SCIP shares representing

13   Bungalow # 12 had been effectively transferred from the Goldens to Panonia in

14   November 1987. (*See* 2/12/21 Tr. Trans. at 27:19-20, 34:13-17.)

15   **J.   Dr. Putz's Use of Bungalow # 12 and Participation in SCIP**

16       54. Beginning in October 1987, when Plaintiffs took possession of Bungalow #

17   12, and continuing through to February 2007, Plaintiffs had the complete use of,

18   possession of, and right to use the bungalow. (2/21/12 Tr. Trans. at 153:20-154:1.)

19       55. Dr. Putz and his family spent time at the bungalow for their personal use and

20   enjoyment for periods of time every year from 1988 through 1998. (2/21/12 Tr. Trans. at

21   34:18-35:9.)

22

1        56.   From at least 1997 through 2006, Plaintiffs rented out Bungalow # 12 and

2   received a total of $161,720.00 in rental income during that time period.  (Bauleke Decl.

3   (Dkt. # 68) ¶ 4(d).)  The average annual rental income for this ten-year period was

4   $16,172.00.  (*See id.*)[4]

5        57.   Although Plaintiffs did not rent out Bungalow # 12 from 1988 through 1996,

6   their control of Bungalow # 12 and ability to rent it out represented value.

7        58.   Plaintiffs paid quarterly maintenance fees to SCIP with respect to Bungalow #

8   12 from 1988 through 2006 totaling $170,332.00.  (2/21/12 Tr. Trans. at 43:5-44:6; Ex.

9   A-109.)

10       59.  After Dr. Putz purchased the SCIP shares associated with Bungalow # 12, he

11  was elected to be a member of the SCIP board or advisory committee.  (2/21/12 Tr.

12  Trans. at 48:4-11; 155:12-17.)  Later, Dr. Putz served as SCIP's *gerant* from May 1994 to

13  2001.  (*Id.* at 48:4-11; 155:18.)  Only SCIP shareholders are eligible to fill the position of

14  *gerant*, which is managerial in nature.  (Proposed Pretrial Order at 4 (Admitted Fact # 6).)

15       60.  Dr. Putz described his responsibilities as *gerant* as similar to those of a

16  manager or president of a company (*id.* at 34:8-12; 156:7-10) and has admitted that

17  SCIP's *gerant* has the ability to approve the transfer of shares (*id.* at 17:18-20; 2/22/12

18  Tr. Trans. at 61:5-19).

19  _____

20       [4] During trial, Dr. Putz testified that Plaintiffs rented out Bungalow # 12 only from 2004
    through 2006.  (*See* 2/21/12 Off. Trans. at 37:10-38:1.)  This testimony was demonstrated to be
21  false by Panonia's tax returns that Dr. Putz did not produce until after the second day of trial.
    (*See* Ex. A-109.)  The court has previously sanctioned Dr. Putz with respect to his false
22  testimony.  (*See* 5/22/12 Order (Dkt. # 87).)  The court will not repeat the findings detailed in its
    May 22, 2012 order here, but rather incorporates them by reference.

61. During his tenure as *gerant*, Dr. Putz had acrimonious relationships with other SCIP shareholders, including Michael Cavalli and Frank Ergas.  (2/21/12 Tr. Trans. at 163:6-22; 167:9-15; 167:2-170:2; Ex. A-63; 2/22/12 Tr. Trans. at 24:8-26:2; *see* Proposed Pretrial Order at 4 (Admitted Fact # 7).)

62. In 2002, Dr. Putz was removed as *gerant* by a French Polynesian court, and was replaced by Mr. Ergas.  (2/21/12 Tr. Trans. at 163:23-164:15; Proposed Pretrial Order at 4 (Admitted Fact # 7).)

**K. Plaintiffs' Attempts to Convert SCIP Shares to a Deed.**

63. In October 2002, Plaintiffs contacted Mr. Ergas, who was the *gerant* for SCIP at that time, and inquired about converting the SCIP shares related to Bungalow # 12 into a deed.  (2/21/12 Tr. Trans. at 49:2-20; Ex. 19.)

64. When Plaintiffs were unable to effectuate a conversion of the SCIP shares related to Bungalow # 12 into a deed through communications with SCIP's management and Mr. Ergas, Panonia sued SCIP in a French Polynesian court in 2004.  (2/21/12 Tr. Trans. at 57:21-60:12; Ex. 20; 2/22/12 Tr. Trans. at 48:8-19; Proposed Pretrial Order at 4 (Admitted Fact # 8).)  The purpose of Panonia's lawsuit was to force SCIP to convert the shares associated with Bungalow # 12 into a deed.  (2/21/12 Tr. Trans. at 59:20-60:2.) Neither Dr. Putz nor the Goldens were parties to the French Polynesian lawsuit.

65. On March 7, 2005, the French Polynesian court dismissed Panonia's petition on grounds that it lacked jurisdiction.  (2/22/12 Tr. Trans. at 48:8-49:25; Ex. 13.) Panonia appealed this decision.  (2/22/12 Tr. Trans. at 50:4-14; Ex. 15.)

1    66. During the course of the French Polynesian litigation, it became apparent to

2  Plaintiffs that SCIP was taking the position that the shares related to Bungalow # 12 had

3  never been properly transferred from the Goldens to Plaintiffs. (*See* 2/21/12 Tr. Trans. at

4  63:3-6.)

5    67. In May 2005, Dr. Putz contacted the Goldens for the first time since 1987 and

6  sought their assistance with respect to the French Polynesian lawsuit. (*See* 2/22/12 Tr.

7  Trans. at 45:19-24; 88:22-89:1; 2/23/12 Tr. Trans. at 15:16-16:3.) Dr. Golden was

8  willing to assist Dr. Putz in resolving any ownership issues with respect to the SCIP

9  shares.

10    68. Dr. Putz drafted an affidavit for Dr. Golden's signature and asked him to

11  approve and sign it. (2/21/12 Tr. Trans. at 66:9-67:16; 2/22/12 Tr. Trans. at 90:1-7.) Dr.

12  Golden reviewed it, and based on his recollection of events that had occurred eighteen

13  years earlier, he believed that the affidavit was a generally accurate, chronological

14  account of the transaction up to the time of the sale. (2/22/12 Tr. Trans. at 91:8-13;

15  2/23/12 Tr. Trans. at 16:4-23.)

16    69. Dr. Golden executed the affidavit and returned it to Dr. Putz. (2/21/12 Tr.

17  Trans. at 68:2-7; 2/22/12 Tr. Trans. at 91:14-16; 2/23/12 Tr. Trans. at 17:3-9; *see* Ex. 7.)

18    70. The affidavit, as drafted by Dr. Putz and executed by Dr. Golden, states that

19  the general assembly of SCIP had approved the transfer of shares to Dr. Putz in 1987 and

20  that the SCIP shares had been effectively transferred from the Goldens to Panonia. (Ex.

21  7; 2/21/12 Tr. Trans. at 67:7-16.)

22

ORDER- 16

71. Dr. Golden now concedes that he has no recollection of a meeting of the general assembly to approve the transfer of the SCIP shares associated with Bungalow # 12. (2/23/12 Tr. Trans. at 17:19-19:9.) At the time, he carelessly thought that the affidavit was referring to a meeting of SCIP's board or advisory committee, and his mistake was inadvertent. (*Id.* at 18:1-7.)

72. After obtaining the affidavit from Dr. Golden in 2005, Dr. Putz had no further contact with Dr. Golden until 2007. (2/21/12 Tr. Trans. at 68:16-19; 2/22/12 Tr. Trans. at 91:17-19.)

73. On March 27, 2008, the French Polynesian court of appeals ruled that the lower court "should not have declared himself without jurisdiction," and referred the matter back to the lower court. (2/22/12 Tr. Trans. at 104:14-18; Ex. 15; Proposed Pretrial Order at 4 (Admitted Fact # 8).)

74. Dr. Putz has interpreted the French Polynesian court of appeal's ruling to mean to the court has declared that the Goldens are the lawful owners of the SCIP shares associated with Bungalow # 12. (*See* Ex. 43 at 1; *see also* Ex. A-22.) However, the courts in French Polynesia have not resolved the issue of ownership of the shares. (*See* 2/22/12 Tr. Trans. at 104:4-106:5; Proposed Pretrial Order at 4 (Admitted Fact # 8).)

75. No further proceedings have occurred in the French Polynesian litigation, and Plaintiffs have represented that they do not intend to pursue litigation in French Polynesia. (2/21/12 Tr. Trans. at 88:22-89:15; Proposed Pretrial Order at 4 (Admitted Fact # 8).)

**L.  Plaintiffs' Ouster from Bungalow # 12.**

76. The acrimonious relationship between Dr. Putz and SCIP continued throughout 2007 and 2008.

77. In February 2007, Dr. Putz placed an advertisement in a local newspaper offering to rent Bungalow # 12.  (2/21/12 Tr. Trans. at 38:18-25.)  When, however, a prospective renter visited the bungalow, the prospective renter saw a notice posted on the door prohibiting either Dr. Putz or Panonia from entering the premises and denying their authorization to rent out the bungalow to others.  (*Id.* at 38:25-39:10, 69:1-25; Exs. 25, 41.)

78. Thus, through this action in February 2007, SCIP effectively ousted Dr. Putz and Panonia from possession of Bungalow # 12.  (*See* 2/23/12 Tr. Trans. at 19:13-15; Proposed Pretrial Order at 4 (Admitted Fact # 9).)

79. Dr. Putz notified the Goldens about his ouster from Bungalow # 12 by SCIP. (2/21/12 Tr. Trans. at 39:11-14, 70:1-71:4; Ex. 25.)  The Goldens, however, played no role and were not involved in SCIP's decision to oust Plaintiffs from Bungalow # 12.

**M.  The Power of Attorney**

80. Following his ouster, Dr. Putz contacted the Goldens during February 2007 and sought their assistance in regaining his ability to rent out Bungalow # 12.  (2/21/12 Tr. Trans. at 71:15-21.)  He asked them to execute a power of attorney that would enable him to re-enter the bungalow and rent it out.  (*See* Ex. 25.)

81. The form of the power of attorney that Dr. Putz presented to the Goldens for their execution was not limited to allowing Plaintiffs to rent out Bungalow # 12.  (2/21/12

Tr. Trans. at 171:13-172:12; 2/22/12 Tr. Trans. at 92:16-93:3.)  The proposed power of

attorney contained language that was critical of SCIP, with which the Goldens were not

comfortable, and it was broader than necessary to accomplish the goal of allowing

Plaintiffs to rent the bungalow to third-parties.  (2/22/12 Tr. Trans. at 92:24-93:3.)  Dr.

Golden was concerned that the broadly worded power of attorney suggested by Dr. Putz

would embroil the Goldens in Dr. Putz's acrimonious dealings with SCIP.  (2/21/12 Tr.

Trans. at 93:4-95:9.)  After consulting with their attorney, and based on his advice, the

Goldens were unwilling to sign the proposed power of attorney provided by Dr. Putz.

(*See id.* at 109:6-110:1, 113:16-114:2; Ex. A-17.)

82. In the course of their correspondence concerning the power of attorney, Dr.

Golden asked Dr. Putz to execute a "hold harmless" agreement.  (2/21/12 Tr. Trans. at

71:22-73:10; Ex. A-22.)  Dr. Putz refused to execute the "hold harmless" agreement

because he believed that it would effectively hold the Goldens harmless for their conduct

with respect to the transaction back to 1987.  (2/21/12 Tr. Trans. at 72:24-74:9; Ex. A-

70.)

83. Dr. Putz never provided the Goldens with a power of attorney that was more

narrowly tailored to permitting Plaintiffs to rent the bungalow to third-parties.  (2/21/12

Tr. Trans. at 113:25-114:2.)

84. The Goldens were willing to transfer Bungalow # 12 back to Plaintiffs

following Plaintiffs' ouster, and repeatedly offered to do so.  (*See, e.g.*, 2/22/12 Tr. Trans.

at 115:13-116:15; 117:17-23; Exs. A-24, A-26.)  Plaintiffs, however, have asserted that

SCIP would not allow such a transfer.  (Exs. 32, 33, 42.)

**N. The Goldens' Re-Possession of Bungalow # 12 and Assertion of Rights and Responsibilities Consistent with Ownership**

85.  On August 2, 2008, Mr. Ergas, as *gerant* of SCIP, sent a letter to the Goldens and advised them that, from his and SCIP's perspective, the Goldens were now responsible for the payment of maintenance dues with respect to Bungalow # 12. (2/22/12 Tr. Trans. at 119:18-120:18; Ex. A-32.)  Mr. Ergas further advised that the dues associated with Bungalow # 12 had not been paid since 2006.  (Ex. 32.)  Finally, Mr. Ergas advised the Goldens that if they did not pay the dues within 30 days, the SCIP shares representing Bungalow # 12 would be sold at auction.  (*Id.*)

86.  Mr. Ergas's August 2, 2008 letter was the first contact that the Goldens had received from SCIP since 1987.  (2/22/12 Tr. Trans. at 120:1-3.)  Mr. Ergas informed the Goldens that, from SCIP's perspective, the Goldens were the owners of record with regard to the SCIP shares related to Bungalow # 12.  (2/22/12 Tr. Trans. at 130:2-5; Exs. 39, A-41.)

87.  Dr. Putz told Mr. Golden that it was the Goldens' responsibility to pay the dues that were in arrears to prevent the bungalow from being sold at auction.  (2/22/12 Tr. Trans. at 125:4-15; Ex. 43 at 2-3.)

88.  The Goldens decided to pay the dues to prevent the bungalow from being sold at auction.  (2/22/12 Tr. Trans. at 126:14-24.)  Accordingly, the Goldens paid $22,622.02 to SCIP for the past due maintenance dues on Bungalow # 12.  (*Id.*)

89.  The Goldens have continued to pay the dues associated with Bungalow # 12 as those dues have accrued.  (*Id.* at 126:22-24; Ex. A-55.)  As of the date of the trial, the

1  Goldens have paid a total of $47,703.07 in dues and related fees on Bungalow # 12.

2  (2/22/12 Tr. Trans. at 127:15-128:12; Ex. A-55.)

3      90.  In addition to paying the maintenance dues on Bungalow # 12, the Goldens

4  have attempted to sell the SCIP shares related to the bungalow on two occasions.

5  (2/22/12 Tr. Trans. at 129:23-25; 2/23/12 Tr. Trans. at 28:15-29:11.)

6      91.  The Goldens attempted to sell the SCIP shares related to Bungalow # 12 in

7  January 2009 for $150,000.  The sale fell through when the buyer failed to obtain

8  financing.  (2/23/12 Tr. Trans. at 28:21-29:4.)

9      92.  The Goldens also attempted to sell the SCIP shares related to Bungalow # 12

10  to the current *gerant* of SCIP, Pierre English, for $110,000.  (2/23/12/ Tr. Trans. at 29:5-

11  8.)  This sale was put on hold after the filing of litigation in the United States – naming

12  both the Goldens and SCIP as defendants.  (*Id.* at 29:9-11.)

13      93.  If either of the sales of Bungalow # 12 had gone through, the Goldens

14  intended to recoup their expenses with respect to association dues that they had paid on

15  Bungalow # 12, and then remit any remaining funds to Dr. Putz.  (2/23/12 Tr. Trans. at

16  29:12-18.)

17      94.  On a couple of occasions following Dr. Putz's ouster by SCIP, Dr. Golden

18  held himself out as the owner of Bungalow # 12.  (2/23/12 Tr. Trans. at 30:13-31:9; Exs.

19  39, A-44.

20  **O. Value and Condition of Bungalow # 12**

21      95. The Goldens have valued Bungalow # 12 at approximately $150,000 at the

22  time that SCIP ousted Plaintiffs in 2007.  (Def. Resp. to OSC (Dkt. # 83) at 4.)  They

1    have placed a present day value on the bungalow of approximately $132,000.00.  (Def.

2    Prop. Findings ¶ 51 at 11.)

3          96.  Other bungalows within SCIP, which are similar to Bungalow # 12, have been

4    recently valued between $116,000.00 to $120,000.00.  (2/22/12 Tr. Trans. at 27:21-

5    28:25.)

6          97.  Dr. Golden received two offers to buy Bungalow # 12 for $150,000.00 in 2009

7    and $110,000.00 in 2010.  (2/23/12 Tr. Trans. at 27:15-29:8.)

8          98.  There are bungalows within SCIP that have been for sale for long periods of

9    time at prices ranging between $150,000.00 to $200,000.00, but these bungalows have

10   not sold at these higher prices.  (2/22/12 Tr. Trans. at 29:1-11.)

11         99.  Some SCIP bungalows have sold for even higher prices, but these sales

12   generally occurred prior to Dr. Putz's ouster and certainly prior to 2008.  (2/22/12 Tr.

13   Trans. at 30:11-31:8, Ex. A-42.)  These higher sales also involved bungalows that were

14   located over the water or that had been substantially upgraded.  (*See* 2/23/12 Tr. Trans. at

15   31:10-33:19; Ex. A-50.)  A bungalow in similar condition to Bungalow # 12 was listed

16   for sale in 2009 at an asking price of approximately $140,000.00.  (*See* Ex. A-50.)

17         100.  Bungalow # 12 has never been upgraded and its furnishings were several

18   decades old at the time of Dr. Putz's ouster.  Other than painting in 1988 and 1990, and

19   basic maintenance and repairs to the roof and for termite damage, Plaintiffs made no

20   major improvements and did little updating of the Bungalow from 1987 through 2006.

21   (*See* 2/21/12 Tr. Trans. at 40:13-41:4.)  With the exception of a few small items, the

22   furnishings, including the kitchen, that were in Bungalow # 12 at the time of Dr. Putz's

ORDER- 22

1    ouster were the same furnishings that Mrs. Golden had purchased 35 years earlier.

2    (2/23/12 Tr. Trans. at 40:7-41:7.) [5]

3    **P. Plaintiffs File Suit in the United States**

4        101.    In 2009, Dr. Putz and Panonia sued the Goldens in United States District

5    Court for the Western District of Virginia.  On December 31, 2009, the federal district

6    court in Virginia dismissed the action for lack of personal jurisdiction.

7        102.    On April 30, 2010, Dr. Putz and Panonia filed suit once again against the

8    Goldens in this court.

9    _____

10       [5] Plaintiffs have asserted that the value of Bungalow # 12 is between $200,000.00 and
     $500,000.00.  (Pl. Resp. to OSC (Dkt. # 84) at 2.)  As indicated above, the weight of the

11   evidence at trial does not support this higher valuation.  Further, the court notes Dr. Golden's
     prior experience in the area of real estate investment and development which lends credence to

12   his valuation of the property.  In addition, as the court indicated in its findings concerning
     credibility, to the extent that the testimony of Dr. Golden and Dr. Putz conflicts, the court credits

13   Dr. Golden's testimony over Dr. Putz's.  Accordingly, Plaintiffs, who bear the burden on this
     issue, have failed to establish that Bungalow # 12 should be valued between $200,000.00 and

14   $500,000.00.

15       Plaintiffs also assert that they were not permitted to appraise Bungalow # 12 because they
     were locked out.  (2/23/12 Tr. Trans. at 52:21-53:2; 86:9-17.)  However, Plaintiffs never raised

16   this issue during the discovery period when the court could have addressed it in a timely matter.
     By waiting until trial, Plaintiffs waived any objection based on their asserted inability during the

17   discovery period to obtain an appraisal.

18       Finally, Dr. Putz testified that because in 1987 he fortuitously placed the shares related to
     Bungalow # 12 in a foreign corporation, this would enable him to get around a 1996 French

19   Polynesian law requiring all foreign purchasers of real estate to seek approval from the French
     Polynesian government.  As a result, Dr. Putz testified that he would be able to sell Bungalow #

20   12 at a premium to foreign investors looking to obtain property without the necessity of seeking
     French Polynesian government approval.  (*See* 2/21/12 Tr. Trans. at 119:7-121:18.)  However,
     the testimony of another SCIP shareholder, Mr. Michael Cavalli, is to the contrary.  Mr. Cavalli's

21   SCIP shares are also held by a California corporation that he wholly owns.  (2/22/12 Tr. Trans. at
     18:17-19:6.)  Nevertheless, he testified that there is no great disparity between the local and

22   foreign market in such circumstances.  (*Id.* at 29:1-11.)  Consistent with its findings with respect
     to credibility, the court credits the testimony of Mr. Cavalli in this regard.

## II.   CONCLUSIONS OF LAW

The court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because this action involves citizens of different states and the amount in controversy exceeds $75,000.00.   The parties agree that Washington law governs this action.

### A.  Principles of Comity Do Not Require Abstention

1.  The Goldens assert that the court should decline jurisdiction over this case under principles of international comity.  The court, however, concludes that it should not decline to exercise its jurisdiction.

2.  "Comity is a recognition which one nation extends within its own territory to the legislative, executive or judicial acts of another." *In re Grand Jury Proceedings*, 709 F. Supp. 192, 195 (C.D. Cal. 1989) (quoting *Somportex Ltd. v. Philadelphia Chewing Gum Corp.* 453 F.2d 435, 440 (3d Cir. 1971)).  Application of the principles of international comity "is limited to cases in which 'there is in fact a true conflict between domestic and foreign law.'" *In re Simon*, 153 F.3d 991, 999 (9th Cir. 1998) (quoting *Hartford Fire Ins. Co. v. Cal.*, 509 U.S. 764, 798 (1993)).

3.  Where there is only the possibility of an inconsistency between a future judgment of a domestic court and a future judgment of a foreign court, there is no "true conflict." *See Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1134, 1156 (C.D. Cal. 2005).  In such cases, "[t]he potential of conflicting findings is more properly characterized as raising the issue of international abstention rather than international comity." *Id.* at 1157.

1    4.   Here, the court concludes that there is no "true conflict."  The proceedings in

2   French Polynesia are not presently on-going.  Plaintiffs have represented that they do not

3   intend to pursue litigation in that court.  The only ruling made by the French Polynesian

4   court of appeal was to the effect that the lower court should not have declared itself to be

5   without jurisdiction.  Further, the issue before the French Polynesian court, whether the

6   SCIP shares related to Bungalow # 12 could be converted to a deed, is not an issue that

7   this court has been asked to address.  Thus, the court concludes that there is no "true

8   conflict."  In other words, there is no reason to believe that the parties could not comply

9   with an order or judgment of this court.  *See In re Grand Jury Proceedings,* 40 F.3d 959,

10  964 (9th Cir. 1994) ("A party relying on foreign law to contend that a district court's

11  order violates principles of international comity bears the burden of demonstrating that

12  the foreign law bars compliance with the order.") (citing *In re Grand Jury Proceedings*

13  *(Shams)*, 873 F.2d 238, 239-40 (9th Cir. 1989)).

14    5.   The court, however, acknowledges that there is a possibility of an

15  inconsistency between a judgment of this court and a future judgment of a foreign court.

16  Thus, the issue before the court is more properly characterized as one of international

17  abstention.  *Mujica*, 381 F. Supp. 2d at 1156.

18    6.   Analysis of international abstention should be guided by the principles set forth

19  in *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976).

20  *See Neuchatel Swiss Gen. Ins. Co. v. Lufthansa Airlines*, 925 F.2d 1193, 1194-95 (9th

21  Cir. 1991) (vacating district court's stay of action in deference to parallel proceedings in

22  Geneva, Switzerland pursuant to *Colorado River* doctrine).  Under the *Colorado River*

1   doctrine, courts have a "virtually unflagging obligation" to exercise the jurisdiction they

2   have been given.  424 U.S. at 817.  "Abstention . . . is the exception not the rule," and it

3   is "an extraordinary and narrow exception" that "can be justified  . . . only in the

4   exceptional circumstances where . . . [it] would clearly serve an important countervailing

5   interest."  *Id.* at 813.

6          7.  The "mere potential for conflict in the results of adjudications, does not,

7   without more, warrant staying exercise of federal jurisdiction."  *Id.* at 816.  The factors to

8   consider in determining whether a stay is appropriate, include:  (1) whether either court

9   has assumed jurisdiction over a res, (2) the relative convenience of the forums, (3) the

10  desirability of avoiding piecemeal litigation, (4) the order in which the forums obtained

11  jurisdiction, (5) what law controls, and (6) whether the foreign proceeding is adequate to

12  protect the parties' rights.  *See Nakash v. Marciano,* 882 F.2d 1411, 1415 (9th Cir. 1989).

13  "These factors are to be applied in a pragmatic and flexible way, as part of a balancing

14  process rather than as a 'mechanical checklist.'"  *Id.* (quoting *Am. Int'l Underwriters,*

15  *(Phillipines), Inc. v. Continental Ins. Co.,* 843 F.2d 1253, 1257 (9th Cir. 1988)).

16         8.  However, if there is substantial doubt as to whether the foreign proceeding will

17  resolve the federal action, there is no need to even undertake this multifactor analysis.

18  *See Intel Corp. v. Advanced Micro Devices, Inc.,* 12 F.3d 908, 913 n. 7 (9th Cir. 1993).

19              When a district court decides to dismiss or stay under
                *Colorado River*, it presumably concludes that the parallel
20              [] litigation will be an adequate vehicle for the complete
                and prompt resolution of the issues between the parties.  If
21              there is any substantial doubt as to this, it would be a
                serious abuse of discretion to grant the stay or dismissal at
22              all.

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 28 (1983).  Thus, "the existence of a substantial doubt as to whether [proceedings in another forum] will resolve the federal action precludes the granting of a stay."  *Intel,* 12 F.3d at 913.

9.    The court concludes that there is substantial doubt that the French Polynesian proceedings, even if presently on-going, would resolve all of the issues in this action. The Goldens and Dr. Putz are not even parties to the foreign litigation, which involves only SCIP and Panonia.  Further, the purpose of that action was to determine whether the shares associated with Bungalow # 12 could be converted into a deed.  This court will not touch upon that issue.  Here, the litigation is grounded in a contractual dispute between Dr. Putz and Panonia, on the one hand, and the Goldens, on the other hand, concerning the transfer of the shares at issue from the Goldens to Plaintiffs.  The issues of whether the Goldens breached their contractual duties, breached their covenant of good faith and fair dealing, committed any number of other alleged torts, or were unjustly enriched, are not issues that are or have been before the courts in French Polynesia.  *See Ekland v. Marketing Co. of Cal., Inc. v. Lopez*, No. CIV. S-05-0761 FCD/GGH, 2007 WL 2288319 at *4 (E.D. Cal. Aug. 8, 2007) (denying motion to stay proceedings pursuant to international abstention doctrine pending outcome of Spanish proceedings where contracts at issue in the two matters were different, and complaint in federal court also alleged tort claims not at issue in the Spanish proceedings).

10.  Because there is "substantial doubt as to whether the [other] proceedings will resolve the federal action," the court concludes that it may not decline to exercise

ORDER- 27

1  jurisdiction under the international abstention doctrine.  *See Intel*, 12 F.3d at 913.

2  Further, because the Ninth Circuit has found this factor to be dispositive, "it is

3  unnecessary for [the court] to weigh the other factors included in the [] analysis."  *See id.*

4  at 913 n.7.

5       11.  Even if the court were to consider the *Colorado River* factors, the analysis

6  would weigh against a declination of jurisdiction.  Although the shares of SCIP at issue in

7  the French Polynesian litigation relate to a specific bungalow, they are still simply shares

8  in a company or association.  Further, there has never been a share-to-deed conversion

9  with regard to Bungalow # 12.  Thus, there is no indication that the French Polynesia

10  court "has assumed jurisdiction over a res."  *Nakask,* 882 F.2d at 1415.  Further, this is

11  the Goldens' home forum, and the Plaintiffs' chosen forum.  In this action involving an

12  alleged breach of contract between these parties, the court is not convinced that French

13  Polynesia is the more convenient forum, *see id.*, or that Plaintiffs would even be able to

14  obtain jurisdiction over the Goldens in that forum.  In addition, irrespective of the

15  outcome of the French Polynesian action, the court would still likely have to engage in

16  piecemeal litigation because resolution of that action is not determinative of this one.  *Id.*

17  The parties do not dispute that Washington law applies to this litigation, and neither party

18  has alleged that French Polynesian law applies to their dispute.  Thus, the court concludes

19  that the balance of the *Colorado River* factors favor the court's exercise of jurisdiction

20  here.

21

22

**B. Plaintiffs' Breach of Contract Action is Barred by the Statute of Limitations**

12. The statute of limitations for breach of contract is six years, RCW 4.16.040(1), and a cause of action for breach of contract accrues upon breach, *1000 Va. Ltd. P'ship v. Vertecs*, 146 P.3d 423, 430-32 (Wash. 2006).

13. The discovery rule is inapplicable to Plaintiffs' breach of contract claims because the 1987 Agreement does not fall within the limited category of contracts to which the discovery rule applies under *Vertecs*, 146 P.3d at 430-31.

14. Equitable tolling is a legal doctrine that allows a claim to proceed where justice requires, even though it would normally be barred by the statute of limitations. *Trotzer v. Vig*, 203 P.3d 1056, 1062 n.9 (Wash. Ct. App. 2009). Ordinarily, in Washington, the predicates for equitable tolling include: (1) bad faith, deception, or false assurances by the defendant, and (2) the exercise of diligence by the plaintiff. *Id.* at 1062 (citing *Millay v. Cam*, 955 P.2d 791, 797 (Wash. 1998)).

15. After reviewing all the evidence at trial, the court concludes that Plaintiffs failed to establish any "bad faith, deception, or false assurances" on the part of the Goldens that would warrant the court's imposition of equitable tolling.

16. As discussed below, the Goldens did not breach the 1987 Agreement, or at least did not breach it in any material way. Thus, there was no "bad faith, deception, or false assurances" on the part of the Goldens arising out of the original 1987 transaction.

17. Plaintiffs also point to the 2005 affidavit signed by the Goldens as evidence of "false assurances" by the Goldens. Dr. Putz, however, drafted the affidavit he asked Dr. Golden to sign in 2005, and so can hardly complain now as to any inaccuracies. Dr.

1   Golden has testified that he reviewed the affidavit as drafted by Dr. Putz, and that based

2   on his memory in 2005 he believed it be a generally accurate, chronological account of

3   the 1987 transaction.  Nevertheless, based on what he has learned though this litigation,

4   Dr. Golden has now admitted that the 2005 affidavit may be inaccurate in one respect.

5   The affidavit describes a meeting of SCIP's General Assembly to approve the transfer of

6   shares, rather than a meeting of the Board of Directors.  Dr. Golden has explained that at

7   the time, in his mind, he was thinking of a meeting of the Board of Directors, and has no

8   specific recollection of a meeting of the General Assembly.  To the extent that Dr.

9   Golden's affidavit inaccurately refers to a meeting of the General Assembly, rather than a

10  meeting of the Board of Directors, the inaccuracy was an innocent mistake.  In any event,

11  the general substance of the affidavit – that the Goldens received SCIP's approval for the

12  transfer of SCIP shares to Plaintiffs – is accurate.  Accordingly, the affidavit provides no

13  basis for application of the doctrine of equitable tolling here.

14      18.  Recently, however, the Washington Supreme Court has indicated that the

15  doctrine of equitable tolling may apply more broadly than just to situations involving the

16  *Trotzer* predicates.  *See In re Pers. Restraint of Carter*, 263 P.3d 1241, 1247 (Wash.

17  2011); *see also Eriksen v. Serpas*, No. 09–35841, 2012 WL 1454590, at *1 (9th Cir. Apr.

18  27, 2012) (unpublished) ("The current predicates for equitable tolling in civil cases under

19  Washington law are not clear.").  Nevertheless, the Washington Supreme Court has

20  reiterated that "any application of equitable tolling . . . must only be done in the

21  narrowest of circumstances and where justice requires."  *Id.* at 1247-48.

22

1    19.  The court concludes, after hearing and weighing all of the evidence, that the

2  potentially broader application of the equitable tolling doctrine recognized in *Carter* is

3  not warranted on the facts of this case.  *See, e.g.*, *Reed v. Allstate Ins. Co.*, No. C11–

4  0866JLR, 2012 WL 527422 at *5, n.6 (W.D. Wash. Feb. 16, 2012).

5    20.  Accordingly, the court concludes that Plaintiffs' claim for breach of contract is

6  barred by the statute of limitations.

7  **C.  The Goldens Did Not Breach the 1987 Agreement**

8    21. Even if the statute of limitations for breach of contract were subject to

9  equitable tolling here, the court concludes that the Goldens did not breach the 1987

10  Agreement.  Under Washington law, a breach of contract claim is actionable if the

11  contract imposes a duty, the duty was breached, and the breach is a proximate cause of

12  the plaintiff's damages.  *N.W. Indep. Forest Mfrs. V. Dep't of Labor & Indus.*, 899 P.2d

13  6, 9 (Wash. Ct. App. 1995).

14    22.  Plaintiffs assert that the under the 1987 Agreement the Goldens had a duty to

15  transfer the ownership rights in the SCIP shares associated with Bungalow # 12 from the

16  Goldens to Plaintiffs.  Plaintiffs assert that the Goldens violated this duty by failing to

17  "arrange that the Board of Directors will approve the transfer of the stocks as required by

18  the By-laws of the corporation" as stated in paragraph 4 of the addendum.

19    23.  The one-page addendum was drafted by Dr. Putz.  Under general principles of

20  contract interpretation, Washington courts construe ambiguities in an agreement against

21  the drafter.  *Rouse v. Glascam Builders, Inc.*, 677 P.2d 125, 135 (Wash. 1984).

22

1      24. Although SCIP's statutes pertain to the transfer of SCIP shares to third-parties,

2   SCIP's by-laws do not.  Further, nothing in SCIP's statutes require the approval of the

3   "Board of Directors" for a transfer of stock.  Rather, SCIP's statutes describe a

4   "supervisory committee," not a "Board of Directors."  Although members of the

5   "supervisory committee" informally referred to themselves as the "Board," SCIP's

6   statutes do not require approval of the "supervisory committee," rather the statues only

7   require approval of the "management."  Such approval could be provided either by the

8   "supervisory committee" or the *gerant*.  Thus, the language in the addendum, added by

9   Dr. Putz to the contract, created ambiguities with respect to the Goldens' required

10  performance.

11      25. Nevertheless, the court concludes that the Goldens did not breach the 1987

12  Agreement because, under the facts delineated above, they obtained approval from

13  SCIP's "Board of Directors" or "supervisory committee," as well as SCIP's *gerant*, for

14  the transfer.  The Goldens notified the Board of the pending transfer, and not one member

15  of the "Board" voiced any objection.  Further, one of the members of the "Board" (Mr.

16  Brown) was an active participant in the closing of the transaction.  In addition, Ms.

17  Valente and Mr. Brown orally confirmed to Mr. Golden that SCIP did not oppose the

18  transfer of SCIP shares to Plaintiffs.  Finally, Mr. Brown, as *gerant*, could approve the

19  transfer without the other board members, and would not have played the role he played

20  with respect to the closing of the sale unless he had approved of the transfer.

21      26. Plaintiffs also assert that the Goldens breached the 1987 Agreement because

22  they did not follow some of the formalities required by SCIP's statutes with respect to the

1   transfer of shares, such as mailing the notification and request for approval of the sale to

2   SCIP by certified mail, delineating Plaintiffs' address and nationality and the contract

3   price in their notice to SCIP management, and failing to receive a "registered card-letter"

4   in response from SCIP containing SCIP's decision.

5        27. The first page of the 1987 Agreement requires the Goldens to provide "[t]itle

6   to the property . . . free of all encumbrances."  Plaintiffs assert that by failing to review

7   SCIP's statutes prior to the sale and by failing to follow the foregoing particularities

8   within the statutes, the Goldens breached their duty to provide title to the shares "free of

9   all encumbrances."  The court concludes, however, that SCIP waived the performance of

10  these formalities.  Mr. Golden relied upon the representations of Mr. Brown, his fellow

11  board members and SCIP's *gerant*, Ms. Valente, another fellow board member, and Mr.

12  Girard, SCIP's attorney, concerning what was required by SCIP to transfer the shares.

13  Mr. Golden was entitled to rely upon their representations, and those representations are

14  binding upon SCIP.  *See Douglass v. Stanger*, 2 P.3d 998, 1003 (Wash. Ct. App. 2000)

15  ("An agent binds his principal if the agent acts with apparent authority."); *Dickson v.*

16  *Philips*, 230 P. 630, 636 (Wash. 1924) ("It is elementary that the principal is bound by the

17  acts of his agent, committed during the course of the apparent authority of such agent.").

18       28. Further, in light of the overwhelming evidence of SCIP's approval in 1987 of

19  the transfer of shares from the Goldens to Plaintiffs, if the Goldens' failure to strictly

20  adhere to the formalities contained in SCIP's statutes constituted a breach of the 1987

21  Agreement, the breach was not material.  There is no dispute that all the parties involved

22  in the transfer of shares, including SCIP, recognized and approved of the transfer to

1   Plaintiffs in 1987.  Further, there is no dispute that Plaintiffs possessed and used

2   Bungalow #12, in accord with the 1987 Agreement, for almost 20 years.

3       29.  The fact that SCIP acted to oust Plaintiffs from possession of Bungalow # 12

4   nearly 20 years after the 1987 Agreement was fully performed does not mean that the

5   Goldens are responsible for a material breach of the contract.  Indeed, the evidence before

6   the court is that Plaintiffs had an acrimonious relationship with SCIP and various SCIP

7   shareholders at various times throughout the twenty-year period following execution of

8   the 1987 Agreement.  There is no evidence of any communication or contact between

9   SCIP and the Goldens between 1987 – when the Goldens sold their shares – and 2008 –

10  nearly a year after Plaintiffs were ousted.  While SCIP may be asserting today that the

11  shares associated with Bungalow # 12 were never properly transferred to Plaintiffs in

12  1987, SCIP's mere assertion of this fact does not make it so.  Accordingly, Plaintiffs have

13  failed to establish that the Goldens are responsible in any way for SCIP's actions in

14  ousting Plaintiffs in 2007.

15      30.  Thus, the court concludes that the Goldens either did not breach or did not

16  materially breach the 1987 Agreement.  They transferred the SCIP shares to Plaintiffs

17  with the approval of SCIP's management in accord with their contractual duty, and

18  Plaintiffs took possession of Bungalow # 12 and remained in possession of the bungalow

19  for nearly twenty years.

20  **D. The Goldens Did Not Breach the Implied Covenant of Good Faith**

21      31.  Plaintiffs claim that in addition to breaching their contractual obligations, the

22  Goldens also breached the implied covenant of good faith and fair dealing that exists in

1    every contract.  Under Washington law, the duty of good faith and fair dealing arises only

2    in connection with contract terms agreed to by the parties and requires that the parties

3    perform those obligations in good faith.  *See Badgett v. Sec. State Bank*, 807 P.2d 356,

4    360 (Wash. 1991).  The court previously concluded that the Goldens did not breach or

5    materially breach the 1987 Agreement.  As Washington does not recognize "a free-

6    floating duty of good faith unattached to the underlying" contract, *id.*, the court concludes

7    that the Goldens did not breach the covenant of good faith and fair dealing.

8         32.  Relying upon *Coventry v. American States Insurance Company*, 961 P.2d 933,

9    938 (Wash. 1998), Plaintiffs assert that the Goldens' failure to review SCIP's statutes

10   prior to their performance under the 1987 Agreement constituted a breach of the

11   Goldens' duty of good faith and fair dealing.  (*See* Pl. Prop. Findings (Dkt. # 61) ¶¶ 22-

12   23.)  As discussed above, however, the Goldens had the right to rely upon the

13   representations of SCIP's representatives, including SCIP's *gerant*, Mr. Brown, SCIP's

14   attorney, Mr. Girard, and another SCIP board member, Ms. Valente, regarding the

15   requirements for obtaining SCIP's approval.  The Goldens also had the right to rely on

16   the representations of these individuals that SCIP had indeed approved of the transfer.

17        33.  Further, *Coventry* is distinguishable.  *Coventry* involved the duty of good faith

18   owed by an insurance company to its insured.  *See Coventry*, 961 P.2d at 935.  The

19   business of insurance is one affected by the public interest.  *Id.*  Further, the duty of an

20   insurance company to investigate an insured's claim is governed by state regulation.  *Id.*

21   There is no allegation or evidence at trial that the private contract between the Goldens

22   and Plaintiffs involved a business transaction affected by the public interest.  Nor have

ORDER- 35

1  Plaintiffs alleged the existence of any regulations delineating the Goldens' duty to

2  investigate.  The Washington Supreme Court's analysis in *Coventry* is inapplicable here.

3      34.  Plaintiffs also assert that the Goldens' actions following Plaintiffs' ouster

4  constitute a breach of their duty of good faith and fair dealing.  Plaintiffs assert that the

5  Goldens failed to cooperate with Dr. Putz in his dispute with SCIP and in his efforts to

6  regain possession of the bungalow.  Even assuming that such a claim, which is not

7  grounded in a specific provision of the contract, is legally cognizable, the court concludes

8  that the evidence does not support the conclusion that the Goldens refused to cooperate

9  with or to assist Dr. Putz.

10      35.  The evidence before the court is that the Goldens were willing to provide

11  assistance to Plaintiffs in resolving their dispute with SCIP concerning Plaintiffs rights to

12  Bungalow # 12, and did so when Dr. Golden agreed to execute the 2005 affidavit drafted

13  by Dr. Putz.  The Goldens only refused to assist Plaintiffs when Dr. Putz demands went

14  beyond what was reasonably necessary to resolve the situation – such as when Dr. Putz

15  demanded that the Goldens execute a power of attorney in 2008 that contained language

16  with which the Goldens were uncomfortable and that was broader than necessary to allow

17  Plaintiffs to rent out Bungalow # 12.

18      36.  Further, at Dr. Putz's insistence, the Goldens paid the maintenance dues that

19  were in arrears with respect to Bungalow # 12.  In addition, the Goldens continued to pay

20  the dues assessed by SCIP as they accrued.  By paying these dues as demanded by SCIP

21  and instructed by Plaintiffs, the Goldens preserved the SCIP shares and prevented their

22  sale at auction.

37.  Although the Goldens entertained two offers to buy the SCIP shares related to Bungalow # 12 following Plaintiffs' ouster, neither sale was consummated.  The Goldens entertained the offers in an effort to offset their expenses in paying the maintenance dues. The Goldens intended to remit any money they obtained, over and above their expenses, to Plaintiffs.  Finally, because neither sale was ever consummated, the court concludes that there is no causal link between the Goldens' actions in entertaining the offers and any alleged damages on the part of Plaintiffs.

38.  The court cannot conclude that any of the forgoing actions violated any duty of good faith or fair dealing on the part of the Goldens, and accordingly, the court dismisses Plaintiffs' claim for breach of the duty of good faith and fair dealing with prejudice.

**E.  The Goldens Are Not Liable for Negligent Misrepresentation**

39.  A plaintiff asserting the tort of negligent misrepresentation must prove all of the elements of the claim by clear, cogent, and convincing evidence.  *Borish v. Russell*, 230 P.3d 646, 653 (Wash. Ct. App. 2010).

40.  The elements of negligent misrepresentation are:  1) a defendant supplied information that was false, 2) the defendant knew or should have known that the information was supplied to guide the plaintiff in a business transaction, 3) that the defendant was negligent in communicating false information, 4) that the plaintiff justifiably relied upon the information, and 5) the false information was the proximate cause of damages to the plaintiff.  *Id.*; *Ross v. Kirner*, 172 P.3d 701, 704 (Wash. 2007).

1    41. Based on the foregoing findings of fact, and considering the evidence under

2  the appropriate clear, cogent, and convincing standard, the court cannot conclude that

3  Plaintiffs have met their burden of proving that the information supplied by the Goldens

4  to Plaintiffs in 1987 – that the SCIP "board" approved the transfer of the shares or that

5  title to the shares had been transferred "free of all encumbrances" – was false.  SCIP's

6  statutes required approval of the management for transfer of SCIP shares to a third-party.

7  The evidence before the court is that Mr. Golden notified the other two SCIP board

8  members, Mr. Brown and Ms. Valente, concerning the sale, and both of these members

9  approved of the transfer.  In addition, as SCIP's *gerant*, Mr. Brown also had the authority

10 to approve the transfer of SCIP shares to a third-party.  Moreover, SCIP's attorney at the

11 time prepared the *cessation de parts* that granted ownership of the shares associated with

12 Bungalow # 12 to Panonia.  The fact that SCIP's management may be taking a different

13 position today than it took in 1987 with respect to the transfer of shares does not render

14 the Goldens' representations in 1987 concerning the transfer to be false.

15   42. Plaintiffs also assert that Dr. Golden's representations in the 2005 affidavit

16 constitute the tort of negligent misrepresentation.  Dr. Golden executed the 2005 affidavit

17 in an effort to assist Dr. Putz with respect to Panonia's litigation with SCIP in French

18 Polynesia to convert the SCIP shares to a deed.  The court finds that Plaintiffs failed to

19 establish a causal connection between Dr. Golden's statements in the affidavit and any

20 damages suffered by Plaintiffs.  In the affidavit, Dr. Golden asserts that SCIP's

21 management approved the sale of the shares representing Bungalow #12 through a

22 meeting of SCIP's General Assembly.  The court concludes that the first portion of this

1  statement was correct – SCIP's management did approve the transfer of shares.  The

2  second portion, however, that the approval occurred at a meeting of the General

3  Assembly, was false.  The transfer was actually approved by SCIP's supervisory

4  committee or board (consisting of Ms. Valente, Mr. Brown, and Mr. Golden) and SCIP's

5  *gerant* (who at the time was Mr. Brown).  In order to recover, Plaintiffs must demonstrate

6  that the false portion of the affidavit – that approval of the transfer of shares occurred at a

7  General Assembly meeting rather than at a meeting of the board or by the *gerant* –

8  proximately caused Plaintiffs' alleged damages.  Plaintiffs failed to meet this burden by

9  the required "clear, convincing, and cogent" evidentiary standard.

10      43. Accordingly, the court concludes that Plaintiffs' claim for negligent

11  misrepresentation must be dismissed with prejudice.

12  **F.  The Goldens Are Not Liable for Trespass**

13      44. In Washington, "[a] trespass is an intrusion onto the property of another that

14  interferes with the other's right to exclusive possession."  *Phillips v. King Cnty.*, 968 P.2d

15  871, 877 n.4 (Wash. 1998); *see also Bosteder v. City of Renton*, 117 P.3d 316, 332

16  (Wash. 2005), *superseded on other grounds by statute as stated in Wright v. Terrell*, 170

17  P.3d 570, 571 (Wash. 2007).  A person is liable for trespass, even though the person

18  causes no damage, if the person intentionally (1) enters the land in possession of another,

19  or causes another person or thing to do so, (2) remains on the land, or (3) fails to remove

20  from the land a thing which the person has the duty to remove. *Brutsche v. City of Kent*,

21  193 P.3d 110, 116 (Wash. 2008).

22

1    45. In order to establish the tort of trespass, the plaintiff must demonstrate an

2    actual physical invasion or intrusion onto the property of another. *Borden v. City of*

3    *Olympia*, 53 P.3d 1020, 1027 (Wash. Ct. App. 2002) ("[A trespass] claim is viable when

4    there is an intentional or negligent intrusion onto or into the property of another."

5    (internal quotations omitted)). The physical invasion may be either direct or indirect.

6    *See Bradley v. Amer. Smelting & Refining Co.*, 709 P.2d 782, 790 (Wash. 1985). In

7    *Borden*, the court of appeal affirmed the dismissal of a claim for trespass when the

8    plaintiffs could not demonstrate that water from a drainage project actually invaded their

9    property. *Borden*, 53 P.3d at 1027.

10    46. Plaintiffs have failed to demonstrate that the Goldens ever physically invaded

11    or intruded upon Bungalow # 12 or even the SCIP development at large following the

12    Goldens transfer of the SCIP shares to Panonia in 1987. Indeed, the evidence before the

13    court is that the Goldens have not visited Bora Bora since before their execution of the

14    1987 Agreement.

15    47. Plaintiffs also have failed to demonstrate that the Goldens caused or directed

16    anyone else to physically invade Bungalow # 12 or its environs. Although the Goldens

17    have communicated with SCIP management following SCIP's ouster of Plaintiffs from

18    Bungalow # 12, there is no evidence that the Goldens were involved in any way with

19    SCIP's decision to take the actions it did in 2007 with respect to Plaintiffs' ouster, or that

20    the Goldens have directed anyone else since that time period to physically invade the

21    property.

22    48. Accordingly, the court dismisses Plaintiffs' claim for trespass with prejudice.

**G. The Goldens Are Not Liable for Intentional Interference with Business Expectancy**

49.  In Washington, the elements of a claim for tortious interference with a business expectance are:  1) a valid contractual relationship or business expectancy, 2) knowledge of the relationship by the defendants, 3) intentional interference by the defendants inducing or causing a breach or termination of the relationship or expectancy, 4) interference by the defendants based on an improper purpose or improper means, and 5) damages.  *Citoli v. City of Seattle*, 61 P.3d 1165, 1179-80 (Wash. Ct. App. 2002) (citing *Sintra, Inc. v. City of Seattle*, 829 P.2d 765, 780 (Wash. 1992)).

50.  To establish the element of improper purpose or improper means, the plaintiff must show that the interference "is wrongful by some measure beyond the fact of the interference itself."  *Pleas v. City of Seattle*, 774 P.2d 1158, 1163 (Wash. 1989) (quoting *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, 582 P.2d 1365, 1371 (Or. 1978)).

51.  Plaintiffs assert that the Goldens interfered with their prospective business relationships with possible future tenants of Bungalow # 12 by refusing to execute the proposed power of attorney authorizing Plaintiffs to lease out the bungalow to third-parties.  Plaintiffs, however, have failed to establish by a preponderance of the evidence that the Goldens refused to execute the power of attorney for an improper purpose.

52.  Under Washington law, exercising in good faith one's legal interests is not improper interference.  *Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 930 P.2d 288, 300 (Wash. 1997); *Cornish College of the Arts v. 1000 Va. Ltd. P'ship*, 242 P.3d 1, 13 (Wash. Ct. App. 2010).

1    53. The evidence before the court is that the power of attorney proposed by

2    Plaintiffs contained language criticizing SCIP with which the Goldens were not

3    comfortable.  The evidence also establishes that the proposed power of attorney was

4    broader than necessary to accomplish the goal of permitting Plaintiffs to lease or rent out

5    the bungalow.  Finally, the evidence also shows that the Goldens were in discussions with

6    their attorney about the power of attorney proposed by Dr. Putz and were advised by their

7    legal counsel not to sign the power of attorney in the form proposed by Dr. Putz.

8    Accordingly, the court concludes that the Goldens were merely exercising their legal

9    interests in good faith, and therefore Plaintiffs have failed to establish that the Goldens'

10   refusal to execute the power of attorney proposed by Dr. Putz was for an improper

11   purpose.

12   54. Further, Plaintiffs have not established by a preponderance of the evidence

13   that the Goldens were otherwise motivated by an improper purpose.  The Goldens did not

14   oust Plaintiffs from the bungalow, and were not involved in any way in SCIP's decision

15   to take this action.  Following Plaintiffs ouster, the Goldens were willing to take all

16   reasonable actions to transfer the bungalow back to Plaintiffs.  Dr. Putz, however,

17   insisted that SCIP would never approve such a re-transfer.

18   55. Although the Goldens did try to sell the bungalow twice following Plaintiffs

19   ouster, the evidence before the court is that these efforts were merely an attempt to

20   recoup their expenses in terms of the SCIP maintenance fees they paid following

21   Plaintiffs' ouster, and that any amounts left over following this recoupment would be

22   remitted to Plaintiffs.  The evidence demonstrates that the relationship between Dr. Putz

1 and Dr. Golden deteriorated over time, particularly after Dr. Putz began threatening to

2 sue the Goldens.  Nevertheless, Plaintiffs have failed to establish by a preponderance of

3 evidence that the Goldens were motivated by an improper purpose with respect to their

4 dealings with Plaintiffs.

5      56. Accordingly, the court concludes that the Goldens did not intentionally

6 interference with Plaintiffs' business relations.  The court, therefore, dismisses this claim

7 with prejudice.

8 **H. Plaintiffs Are Not Liable on the Goldens' Breach of Contract Counterclaim**

9      57. The Goldens assert that Dr. Putz had multiple opportunities during the course

10 of his possession of Bungalow # 12 and his service as SCIP's *gerant* to fix any alleged

11 defects to the title of the shares.  (*See* Pl. Prop. Findings (Dkt. # 63) at 20.)  The Goldens

12 assert that Dr. Putz's failure to do so amounts to a breach of the covenant of good faith

13 and fair dealing.  The court concludes that Plaintiffs are not liable for breach of contract

14 or for breach of the implied covenant of good faith and fair dealing.

15      58. Every contract contains an implied covenant of good faith and fair dealing.

16 *Frank Coluccio Constr. Co., Inc. v. King Cnty.*, 150 P.3d 1147, 1154 (Wash. Ct. App.

17 2007) (citing *Badgett v. Sec. State Bank*, 807 P.2d 356, 360 (Wash. 1991).  Nevertheless,

18 as discussed above, there is no "free-floating duty of good faith unattached to the

19 underlying legal document." *Badgett*, 807 P.2d at 360.  "[T]he duty arises only in

20 connection with the terms agreed to by the parties." *Id.*  It does not "inject substantive

21 terms into the parties' contract." *Id.*  Rather, "it requires only that the parties perform in

22 good faith the obligations imposed by their agreement." *Id.*

ORDER- 43

1    59. Plaintiffs fully performed the contract at the time they arranged for Mr. Brown

2  to transfer funds representing the contract price of $117,500.00 to the Goldens.  Because

3  there is no "free-floating" duty of good faith, the court concludes that the Goldens have

4  failed to establish their counterclaim.

5    60. Accordingly, the court concludes that Plaintiffs did not breach the 1987

6  Agreement or their duty of good faith and fair dealing with respect to their contract

7  performance, and the court dismisses this counterclaim with prejudice.

8    **I.  Plaintiffs Are Not Liable on the Goldens' Counterclaim for Waste**

9    61. In Washington, RCW 64.12.010 creates a cause of action for waste.  Waste is

10  an unreasonable or improper use, abuse, mismanagement, or omission of duty touching

11  upon real estate by one rightly in possession which results in substantial injury. *Graffell*

12  *v. Honeysuckle*, 191 P.2d 858, 863 (Wash. 1948).

13    62. The Goldens failed to meet their burden of establishing that Plaintiffs

14  committed waste upon Bungalow # 12 while they were in possession of it.  Although the

15  evidence indicates that the property was not substantially updated during the period of

16  Plaintiffs' possession, the evidence does not establish that Plaintiffs committed waste.

17  Indeed, the evidence establishes that Plaintiffs performed appropriate maintenance upon

18  the property during their period of possession.

19    63. Accordingly, the court dismisses this counterclaim with prejudice.

20  ///

21  ///

22  ///

**J. The Court Imposes a Constructive Trust Based on the Goldens' Unjust Enrichment**

64. The Goldens assert that the court should impose or recognize a constructive trust over the bungalow so that it "may fashion an equitable remedy." (*See* Def. Tr. Brief (Dkt. # 62) at 20-21; Def. Prop. Findings ¶¶ 55-60 at 22-23; 2/23/12 Tr. Trans. at 74:15-21, 77:17-78:3.)[6] The Goldens also assert a counterclaim for unjust enrichment. (Ans. at 21.)

65. The equitable issue that has brought the parties to trial is that twenty years after Plaintiffs paid for the SCIP shares related to Bungalow # 12, the Goldens (through no fault of their own) found themselves in possession of the bungalow again. Thus, as the situation stands today, the Goldens have possession of both the bungalow and the purchase price paid by Plaintiffs. Nevertheless, the Goldens have acknowledged that they have no right to retain both, and they do not seek to do so. Rather, the Goldens ask

---

[6] Although constructive trust was not mentioned in the Goldens' counterclaim, the theory was presented in the Goldens' trial brief (Def. Tr. Brief at 20-21), as well as in their proposed findings of fact and conclusions of law (Def. Prop. Findings ¶¶ 55-60 at 22-23), and was expressly argued at trial (2/23/12 Tr. Trans. at 74:15-21, 77:17-78:3). Dr. Putz even testified about the possibility of the imposition of a constructive trust. (*See* 2/21/12 Tr. Trans. at 118:15-119:19.) The court notes that while the Goldens' attorney should have moved to amend their counterclaim to conform to the evidence at trial, this oversight does not prevent the court from considering the constructive trust issue. *See* Fed. R. Civ. P. 15(b)(2). A district court may amend the pleadings merely by entering findings on the unpleaded claims. *Galindo v. Stoody Co.*, 793 F.2d 1502, 1513 n.8 (9th Cir. 1986). Such an amendment is within the court's discretion where the record indicates that the parties understood that the evidence was aimed at an unpleaded issue. *Id.* at 1513. Here, in light of the Goldens' repeated references to the constructive trust issue in their trial brief and their proposed findings of fact and conclusions of law (both of which were filed shortly before trial), as well as the testimony and arguments concerning constructive trust at trial, there is no doubt that the parties understood that this unpleaded claim was at issue during trial.

1   the court to fashion an equitable resolution because the parties have been unable to

2   fashion one for themselves.

3       66. "A constructive trust arises where a person holding title to property is subject

4   to an equitable duty to convey it to another on the ground that he would be unjustly

5   enriched if he were permitted to retain it." *Baker v. Leonard*, 843 P.2d 1050, 1055

6   (Wash. 1993) (quoting *Proctor v. Forsythe*, 480 P.2d 511, 514 (Wash. Ct. App. 1971)).

7   The primary purpose of a constructive trust is to prevent unjust enrichment. *Consulting*

8   *Overseas Mgmt., Ltd. v. Shitkel*, 18 P.3d 1144, 1149 (Wash. Ct. App. 2001).

9       67. A court can impose a constructive trust arising in equity when clear, cogent,

10  and convincing evidence serves as the basis for the decision. *Id.* at 1054. Accordingly,

11  the court applies this standard when considering evidence with respect to this claim.

12      68. Unjust enrichment occurs when one party retains money or benefits that in

13  justice and equity belong to another. *Ballie Commc'ns, Ltd. v. Trend Bus. Sys.*, 810 P.2d

14  12, 18 (Wash. Ct. App. 1991). The doctrine also applies to the retention of property or

15  benefits. *Id.* The inquiry is whether the enrichment is unjust, not whether the holder of

16  the property acted with bad motive or malicious intent. *Brooke v. Robinson*, 104 P.3d

17  674, 677 (Wash. Ct. App. 2004).

18      69. The specific elements of a claim for unjust enrichment are: 1) a party receives

19  a benefit, 2) the benefit is received at another's expense, and 3) the circumstances make it

20  unjust for the party to retain the benefit without payment. *Young v. Young*, 191 P.3d

21  1258, 1262 (Wash. 2008).

22

1    70. Although constructive trusts are most appropriate in situations involving

2    fraud, misrepresentation, or undue influence, courts may impose them in broader contexts

3    not involving wrongdoing.  Nevertheless, where circumstances of fraud or wrongdoing

4    are absent, courts must find an "equitable base" established by evidence of intent before

5    imposing a constructive trust.  *See Baker*, 843 P.2d at 1055; *Wright v. Dave Johnson Ins.*

6    *Inc.*, 275 P.3d 339, 349 (Wash. Ct. App. 2012).

7    71. Although there is no wrongdoing here, the necessary "equitable base" arising

8    from evidence of the parties' intent is present.  There is no dispute that the parties

9    intended ownership of the SCIP shares to transfer to Plaintiffs through execution of their

10   1987 Agreement.  Nevertheless, the Goldens found themselves nearly twenty years later,

11   through no fault of their own, in possession of both the purchase price for the SCIP

12   shares and the SCIP shares themselves without the ability to simply transfer those shares

13   back to Plaintiffs.  Despite their lack of wrongdoing, the Goldens have been unjustly

14   enriched at the expense of Plaintiffs and contrary to the parties' intent in the 1987

15   transaction.  Further, this case involves the unique circumstance of the party who would

16   be burdened by the trust (the Goldens) seeking its imposition so that the court may

17   fashion an equitable result out of the muddle that has arisen with respect to Bungalow #

18   12 because the parties themselves have been unable to do so.  The court concludes that

19   these circumstances satisfy the "equitable base" requirement of Washington's case

20   authority.

21   72. First, the court will determine the nature of the unjust enrichment in this

22   matter.  There is no question that SCIP's actions in ousting Plaintiffs from Bungalow #

12 in favor of the Goldens resulted in an unjust enrichment of the Goldens in an amount

equal to the value of Bungalow # 12 on the day of Plaintiffs' ouster.  In addition to the

value of the bungalow itself, however, the parties have devoted considerable time and

energy to arguing about who should be responsible for the bungalow's expenses over the

years and who should reap the benefits of its income.  The court concludes that both the

expenses and the benefits related to the bungalow should lie with the party in possession

and who exercised dominion over the property during any particular time period.

73. Following execution of the 1987 Agreement, Plaintiffs enjoyed the use and

possession of the bungalow for the next twenty years, approximately.  Dr. Putz and his

family visited the bungalow for their own personal use and enjoyment.  Plaintiffs also

rented the bungalow out to third parties for a portion of the time they were in possession

of it and earned substantial rental income.  Plaintiffs were also responsible for the costs of

repairs to the bungalow and the maintenance fees imposed by SCIP from the date of

closing on the 1987 Agreement until the date in February 2007 when they were ousted.

74. After the Goldens were placed in possession of the bungalow, SCIP threatened

to sell the bungalow at auction unless the Goldens paid the maintenance dues that had

accrued before Plaintiffs were ousted.  Dr. Putz also insisted that the Goldens were

responsible for paying these fees.  As a result, to prevent the bungalow from being sold at

public auction, the Goldens paid the fees that had accrued and have continued paying

these fees to date.  The Goldens assert that they should be made whole with respect to

these payments.  The court disagrees.

75. Once they were in possession, the Goldens could have visited the bungalow for their own personal use or could have rented it to third parties.  The Goldens chose to do neither.  Nevertheless, the value in these potential uses remained.  The court notes that the Goldens did entertain two offers to sell the bungalow, although neither of the potential sales was consummated.  Because they enjoyed complete dominion over the bungalow following Plaintiffs' ouster, the court concludes that it is equitable and just to hold the Goldens responsible for the bungalow's expenses during that period of time as well.  Expenses that the Goldens incurred in maintenance fees or repair costs that accrued while they were in possession of the bungalow shall remain with them.

76. The court concludes that the same is true for Plaintiffs.  It is equitable and just that Plaintiffs, who enjoyed all of the benefits of the bungalow for twenty years (including substantial rental income), should also bear the bungalow's expenses for that period of time.

77. Having concluded that clear, cogent, and convincing evidence demonstrates that the Goldens were unjustly enriched in 2007 when SCIP ousted Plaintiffs from Bungalow # 12 and placed the Goldens back in possession, the court now considers the equitable remedy of constructive trust.  Because the court is "sitting in equity" when creating a constructive trust, "the trial court may fashion broad remedies to do substantial justice to the parties and end the litigation; when equity attaches, it extends to the entire controversy."  *In re Marriage of Lutz*, 873 P.2d 566, 573 (Wash. Ct. App. 1994).  In crafting a constructive trust, the court may grant relief based "largely upon the equities and circumstances of the particular case" and "will adjust the relief in such a manner as

1   will best afford protection to the rights of all the parties concerned." *Bland v. Mentor*,

2   385 P.2d 727, 732 (Wash. 1963).  The court concludes that it should create or recognize a

3   constructive trust according to the foregoing principles to prevent the unjust enrichment

4   of the Goldens at the expense of Plaintiffs and to provide other equitable relief as follows.

5       78.  Based on the evidence at trial, the court concludes that SCIP presently

6   recognizes the Goldens as the rightful owners of Bungalow # 12, and SCIP's

7   management would not approve a transfer of the shares at issue from the Goldens to

8   Plaintiffs.  Accordingly, only the Goldens can sell Bungalow # 12, but they cannot sell it

9   to Plaintiffs.  Due to this state of affairs, the court concludes that placing a constructive

10  trust upon the shares themselves would be ineffective.  Rather, the court will impose a

11  constructive trust in favor of Plaintiffs upon the proceeds of any sale of the SCIP shares

12  at issue up to the amount of the Goldens' unjust enrichment at the time of Plaintiffs'

13  ouster.  *See, e.g.*, *Betchard-Clayton, Inc. v. King*, 707 P.2d 1361, 1365-66 (Wash. Ct.

14  App. 1985) (affirming constructive trust upon $10,000 down payment in commercial real

15  estate deal that failed).

16      79.  The evidence at trial indicates that Bungalow # 12 may have deteriorated in

17  value since Plaintiffs were ousted because little, if any, maintenance has been performed

18  since that time.  In order to ensure that Plaintiffs are made whole with respect to the value

19  of Bungalow # 12 at the time they were ousted, the court will hold the Goldens

20  responsible for any declination in value since 2007, and require the Goldens to make up

21  any difference between the sale proceeds of Bungalow # 12 and the amount of their

22  unjust enrichment in payment to Plaintiffs.

**K. The Value of the Goldens' Unjust Enrichment**

80. Based on the court's foregoing determinations regarding the parameters of an appropriate constructive trust in the present circumstances, the court must determine that amount or value of the Goldens' unjust enrichment. The Goldens have valued Bungalow # 12 at the time they acquired possession in February 2007 at $150,000.000, and placed its present day value at $132,000.00. Under Washington law, "[i]t is longstanding and well-established that a property owner may testify as to the property's market value without being qualified as an expert in this regard." *State v. McPhee*, 230 P.3d 284, 296 (Wash. Ct. App. 2010) (citing *State v. Hammond*, 493 P.2d 1249 (Wash. Ct. App. 1972) & *McCurdy v. Union Pac. R.R*., 413 P.2d 617 (Wash. 1966)). Based on the court's findings of fact concerning value and condition of Bungalow # 12, the court concludes that the bungalow was worth $150,000.00 at the time of Plaintiffs' ouster in 2007. Thus, the court concludes that the amount of the Goldens' unjust enrichment is $150,000.00.

81. Accordingly, if the court were to enter a judgment without a constructive trust, it would do so in the amount of $150,000.00.

82. A simple award of damages and entry of judgment would be inappropriate here. Although the Goldens have been unjustly enriched, they have found themselves in their present circumstances through no fault of their own. The Goldens did not participate in SCIP's ouster of Plaintiffs. Following Plaintiffs' ouster, the Goldens repeatedly offered to simply transfer the SCIP shares back to Plaintiffs. Unfortunately, this straightforward option was not available because SCIP's present management would not approve a transfer of the shares back to Plaintiffs. A simple judgment in the amount

1  contemplated here would represent a harsh result for the Goldens who have been

2  innocently swept into the whirlpool of conflict that has been swirling around Plaintiffs

3  and SCIP for many years.  The imposition of a constructive trust over the proceeds of any

4  sale of the SCIP shares will ease the Goldens' ability to comply with the court's

5  judgment, while at the same time ensuring appropriate compensation to Plaintiffs.

6      83.  Accordingly, based on the court's valuation of the Goldens' unjust

7  enrichment, the court establishes a constructive trust upon the proceeds of any sale of the

8  SCIP shares associated with Bungalow # 12.  The constructive trust shall be effective

9  upon the proceeds in an amount up to, but not exceeding, $150,000.00, plus statutory

10  interest accruing from the date judgment is entered.  *See* RCW 19.52.020.  If the shares

11  associated with Bungalow # 12 ultimately sell for less than $150,000.00, plus statutory

12  interest accruing from the date judgment is entered, then the Goldens shall pay, in

13  addition to the sale amount, any shortfall to Plaintiffs.

14      84.  The constructive trust shall automatically lift, if at any time prior to the sale of

15  the SCIP shares, the Goldens satisfy the judgment of the court by paying Plaintiffs

16  $150,000.00, plus any accrued statutory interest following the entry of judgment.

17      85.  Although Plaintiffs have represented that they do not intend to pursue any

18  legal proceedings with respect to Bungalow # 12 in French Polynesia, the court is aware

19  of the Goldens' on-going concerns that such proceedings could be revitalized and that a

20  future ruling from that court might impact the equities as they presently exist in this

21  matter.  Accordingly, the court will retain equity jurisdiction to address any such issues

22  should they arise and to protect the rights of the parties under this order.

1

### III.   CONCLUSION

2          Based on the foregoing findings of fact and conclusions of law, the court directs

3   the clerk to enter judgment in favor of Plaintiffs for $150,000.00 to be satisfied only

4   pursuant to the parameters of the constructive trust as established by the court above.

5          Dated this 2nd day of July, 2012.

6

7

8   _____

9   JAMES L. ROBART
    United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 53